These appeals are from final judgments entered upon jury verdicts in favor of two classes of plaintiffs. The plaintiffs were all participants in an insurance plan that, due to underfunding, was unable to pay its obligations and failed. Because the plan in question is not a "governmental plan," as that term is used in the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1001 et seq.), we hold that, except for their fraud claims against Life and Health Services, Inc. ("L H"), and its president, Robert Wilder, the plaintiffs' common law claims are preempted by ERISA; therefore, the judgments against L H and Wilder based on fraud are affirmed; the remaining judgments against Wilder and L H, and the judgments against Harbor Insurance Company ("Harbor") are reversed; and the cause is remanded for entry of judgments consistent with this opinion.
The facts that led to this appeal are somewhat complicated, but they can be summarized for the purposes of this opinion. In January 1980, Dr. William McWhorter, the president of one of Alabama's junior colleges, became interested in organizing a consolidated health insurance plan for all of Alabama's junior, community, and technical colleges.[1] He sent questionnaires to the presidents of the other schools to ascertain their interest in such a plan. Once the results were compiled, they were provided to L H, a third-party administrator of insurance plans with which Dr. McWhorter had had periodic contact concerning the then-existing insurance plan at his college.
In the fall of 1980, a joint committee of presidents of the colleges ("the Committee") was appointed by the Presidents' Association to study the then-existing insurance plans of the schools and to make recommendations for any changes. The Committee concluded that a self-funded insurance plan should be created; and it initially recommended a plan offered by Central Bank in association with Blue Cross, with life insurance provided by American Foundation Life Insurance Company.
The Committee again contacted L H, this time to determine whether L H could offer a better rate for the same coverage offered by Central Bank. Wilder undertook the task of "selling" the L H plan to the Committee and, subsequently, to the individual employees. Although he knew that the plan was underfunded, based on the calculations and assumptions upon which it was premised, Wilder failed to disclose this fact to either the Committee or to the individual employees who chose to accept the plan.
The alternative plan proposed by L H called for lower premiums than did the plan offered by Central Bank, and it was accepted by the Committee. This plan was reinsured by Harbor. The acceptance of the L H plan led to the creation of the Alabama Junior/Community Colleges and Technical Colleges Employee Benefit Plan ("the Plan"). The Plan was subsequently presented to the employees of the schools and, eventually, over 1,300 employees at 28 of the schools decided to participate. The Plan collapsed after just one year of operation.
Following the collapse of the Plan, certain participants instituted several actions *Page 331 
to recover damages from Wilder, L H, and Harbor. After certification of the classes and consolidation of the actions, the cases proceeded to trial. The trial court ruled that the Plan was a "governmental plan" and, therefore, exempt from the provisions of ERISA. The jury returned special verdicts against Harbor on negligence claims, and against Wilder and L H on negligence, wantonness, and fraud claims. These appeals followed.
On appeal, as at trial, the parties raise the issue of the preemptive effect of ERISA. Two threshold questions are presented: 1) Whether the Plan is one "established or maintained" by a governmental body and thus excepted from ERISA's operative effect; and 2) whether the plaintiffs' claims for fraud against Wilder and L H fall outside the operative effect of the federal act. Because we find that the "governmental plan" exception to ERISA does not apply, we hold that the common law causes of action based upon negligence and wantonness, under which the plaintiffs recovered against all of the defendants, are preempted; thus, the judgments based on these claims are reversed. We further hold that the fraud claims against Wilder and L H, amounting to claims for fraudulent inducement, are not preempted; thus, the judgments against these defendants on that claim are affirmed.
 I.
In our treatment of the "governmental plan" exception, we have undertaken a three-part analysis: 1) The first step, when examining any insurance or benefit plan, is to determine whether the plan falls within the scope of ERISA's coverage; 2) if the plan is so covered, then we must next examine the exceptions to ERISA to ascertain whether any of them apply; and, finally, 3) if we find that the plan is within ERISA's coverage, and that no exception applies, we must examine the preemptive effect of these determinations.
Our inquiry begins with the language of the statute itself. The applicable section of ERISA, governing the scope of its coverage, is found at 29 U.S.C. § 1003:
 "(a) Except as provided in subsection (b) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained —
 "(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or
 "(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or
"(3) by both.
 "(b) The provisions of this subchapter shall not apply to an employee benefit plan if (1) such plan is a governmental plan (as defined in section 1002(32) of this title). . . ."
The definitions of an "employee welfare benefit plan" and of a "governmental plan" are found at 29 U.S.C. § 1002, which states, in relevant part:
 "(1) The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . .
". . . .
 "(32) The term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."
It is undisputed that the Plan involved in the present appeal is an employee benefit plan covered by the provisions of ERISA.[2] *Page 332 
There is a dispute, however, over whether an exception to coverage applies. As noted earlier, the trial court ruled that the "governmental plan" exception applied and, therefore, that ERISA did not control the determination of liability under the Plan. We disagree.
Although the "governmental plan" exception has been discussed in several cases, an analysis of the available authority leaves us without a clear, definitive standard by which we may determine whether the Plan is a governmental plan. Thus, any plan must be closely examined to determine whether it falls within this exception to the coverage of ERISA. Initially, we must bear in mind the broad scope of ERISA's preemption in the employee benefit field.
 "In determining whether various benefit policies fall within ERISA, courts should interpret the act's coverage broadly. Sly v. P.R. Mallory Co., 712 F.2d 1209, 1211 (7th Cir. 1983)."
Schwartz v. Newsweek, Inc., 653 F. Supp. 384, 387
(S.D.N.Y. 1986), aff'd, 827 F.2d 879 (2d Cir. 1987).
One of the first cases to discuss the "governmental plan" exception was Feinstein v. Lewis, 477 F. Supp. 1256 (S.D.N Y 1979), aff'd, 622 F.2d 573 (2d Cir. 1980). In Feinstein, the court considered whether employee welfare plans, established as the result of a collective bargaining agreement between a union of public employees and their municipal or school district employers, were "governmental plans." The court went into a thorough discussion of the term "governmental plan" before ruling that the exception applied to the plans in question. In its analysis of the intention of Congress in enacting ERISA, the court stated:
 "These discussions clearly demonstrate that Congress, in exempting governmental plans, was concerned more with the governmental nature of public employees and public employers than with the details of how a plan was established or maintained."
Id. at 1262.
In its holding that the "governmental plan" exception applied, the Feinstein court emphasized that the governmental instrumentality, as the employer, provided 100% of the funding for the plans. Further, the Feinstein court reasoned that the mere fact that the public employers acted in conjunction with the employees' union, pursuant to a collective bargaining agreement, to establish and maintain the benefit plan, "does not lead us to the conclusion that the plan was not 'established' by the [public employers]." Id. at 1260.
An equally extensive discussion of the 'governmental plan' exception is found in Rose v. Long Island R.R. Pension Plan,828 F.2d 910 (2d Cir. 1987), cert. denied, 485 U.S. 936,108 S.Ct. 1112, 99 L.Ed.2d 273 (1988). The court in Rose ruled that a plan established by the Long Island Railroad was, under the facts of the case, a governmental plan. Of particular interest is the analysis used by the Rose court to define the terms "agency or instrumentality." These two terms are not defined in ERISA; but the Rose court reasoned that the definitions given these terms by the Internal Revenue Service, one of the agencies charged with enforcing ERISA, were entitled to great deference. The term "governmental plan" is defined at 26 U.S.C. § 414(d), and this definition is virtually identical to the one found at 29 U.S.C. § 1002(32).
 "In interpreting the § 414(d) exemption, the IRS has consistently relied on Revenue Ruling 57-128, 1957-1 C.B. 311, which lists six factors to be considered in determining whether a particular entity is an agency or instrumentality:
 "In cases involving the status of an organization as an instrumentality of one or more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and *Page 333 
performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the sources of its operating expenses."
Rose, 828 F.2d at 918.
After an examination of these factors, as they relate to the present appeal, we find that the Plan was not established or maintained by an agency or instrumentality of the State of Alabama, or any political subdivision of it. While it could be argued that some of the six factors listed above apply to the Plan, we nonetheless conclude that, under the totality of the circumstances, the Committee was not an agency or instrumentality of the State; thus, the Plan is not a governmental plan.
Because we find that the Committee is not an agency or instrumentality of the state, we further hold that the Plan was not established or maintained by the state. The Plan was established by the independent actions of the presidents of some of Alabama's junior and technical colleges. This clearly does not meet the establishment criteria contained in the "governmental plan" exception. Neither is the Plan maintained by the state. The only fact that supports the allegation that the Plan was maintained by the state is that part of the premiums paid by the participants came from funds provided by the state, to all similarly situated employees, that these employees could use to pay for part of any insurance coverage they chose. This payment, which came indirectly from the state, is not sufficient to support a conclusion that the Plan was maintained by the State.
Our conclusion is further supported by the fact that the "governmental plan" exception was contemplated as a narrow exception to the otherwise expansive coverage of ERISA. In a federal case quite similar to the present one, the district court discussed the reasons behind a narrow construction of this exception:
 "Indeed, the legislative history's frequent reference to the exception simply as the 'governmental plan' exception, . . . without ever elaborating on the significance of the individual terms chosen to describe the scope of the exception, suggest that the exception was meant to cover the entire range of organizations traditionally characterized as governmental organizations, but not to expand the range to include organizations having some significant relationship with a government but not themselves viewed as governmental."
Krupp v. Lincoln University, 663 F. Supp. 289, 292
(E.D.Pa. 1987).
In Krupp, the court ruled that a university's health care plan was not a governmental plan, even though a legislative act had established the university as an instrumentality of the Commonwealth. The fact that the university was characterized as a "state-related institution," reasoned the Krupp court, did not mandate that its insurance plan be considered a governmental plan. We approve the rationale for the Krupp
decision, and we hold that the instant Plan is not a governmental plan.
As was previously mentioned, we realize that there is no clear guide to determine when the "governmental plan" exception to ERISA applies. There have been cases involving colleges in which the insurance plan was properly found to be a governmental plan. See ERISA Op. Letter No. 77-13; and ERISA Op. Letter 76-128. However, under the particular facts of the present case, we do not find these authorities to be controlling here.[3] *Page 334 
Because the "governmental plan" exception does not apply to the instant Plan, the provisions of ERISA are applicable here. The preemptive provisions of ERISA are found at 29 U.S.C. § 1144:
 "Except as otherwise provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975."
In discussing this section, the United States Supreme Court has provided guidance in understanding the scope of the preemptive aspects of ERISA:
 "To summarize the pure mechanics of the provisions quoted above: If a state law 'relate[s] to . . . employee benefit plan[s],' it is preempted. § 514(a). The saving clause excepts from the preemption clause laws that 'regulat[e] insurance.' § 514(b)(2)(A). The deemer clause makes clear that a state law that 'purport[s] to regulate insurance' cannot deem an employee benefit plan to be an insurance company. § 514(b)(2)(B) [state laws that regulate insurance, banking, or securities are not preempted by ERISA].
 ". . . We have observed in the past that the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.' [Citations omitted.]"
Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45,107 S.Ct. 1549, 1551-1552, 95 L.Ed.2d 39 (1987).
 II.
In regard to the state common law claims for fraud against Wilder and L H, we hold that these claims are not preempted under the provisions of ERISA and we affirm that aspect of the trial court's judgments. In the recent case ofHealthAmerica v. Menton, 551 So.2d 235 (Ala. 1989), we held that a claim for fraud in the inducement does not "relate to" an employee benefit plan and is therefore not preempted by ERISA.
In the instant case, the plaintiffs, relying upon, among other things, Wilder's misrepresentations that the plan was "fully funded," forwent accepting the plan offered by Central Bank and accepted the L H Plan. With their acceptance of the L H Plan, however, the plaintiffs did not receive the promised benefits. The plaintiffs, according to their claim for misrepresentation, were not damaged as a result of the fraudulent administration of the Plan or as a result of non-payment pursuant to the Plan; rather, as a consequence of the misrepresentations and promises of benefits, they were induced to accept the L H Plan, as opposed to a more adequately funded plan. This "fraud in the inducement" claim is not covered by the provisions of ERISA; therefore, it falls outside ERISA's preemptive effect.
The facts of the instant case fall clearly within the holding in HealthAmerica. L H knew that the Committee had received from Central Bank a proposal for a plan in which the Committee had expressed an interest. In order to "sell" its proposal to the Committee and the schools' personnel, L H had to offer a plan that was competitive with that proposed by Central Bank. The fraud committed by Wilder, on behalf of L H (i.e., offering the Plan with knowledge that L H's own actuarial criteria for a viable plan showed inadequate funding), was aimed at inducing the Committee and the individuals it represented to select L H's proposal over that of its competitor. Conduct of this nature will be not be tolerated in Alabama; and it was not the intent of Congress, in enacting ERISA, to preclude state regulation of such activity. SeeHealthAmerica, supra, and the cases cited therein.
L H contends that the trial court erred in certifying the plaintiff classes because "commonality" and "typicality" do not exist, as required by A.R.Civ.P. 23(a)(2) and (3). We disagree, and we hold that there are questions of law and fact common to the classes and that the claims of *Page 335 
the representative parties are typical of the claims of the classes.
Although the misrepresentations were made to the members of each class at varying times, the misrepresentations were basically the same and were redressable under the same theory of recovery. Where plaintiffs allege and prove a standard claim for fraud based on misrepresentations with a common thread, as is the case here, their cause is maintainable as a class action.
It is within the sound discretion of the trial court to certify a class under Rule 23, and we will reverse such a ruling only upon a showing of an abuse of that discretion.Marshall Durbin of Jasper, Inc. v. Jasper Utilities Board ofthe City of Jasper, 437 So.2d 1014 (Ala. 1983). We have not been shown that the trial court abused its discretion in certifying the classes in the instant case.
Therefore, the judgments against Wilder and L H, based on the non-preempted fraud claims, are affirmed; the judgments against all the defendants based on the remaining preempted state law claims are reversed; and the cause is remanded for entry of judgments consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS AS TO 87-391 AND 87-407.
AFFIRMED AS TO 87-487.
HORNSBY, C.J., and ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX, ALMON, SHORES and HOUSTON, JJ., concur in part and dissent in part.
[1] The Alabama Trade School and Junior College Authority Act is codified at Ala. Code 1975, § 16-60-80 et seq.
[2] It is important to note here that, while the Plan is covered by ERISA, a further determination is required to test ERISA's preemptive effect on the separate state law claims on which the special verdicts were based. See our later discussion of the fraud-in-the-inducement claims under part II of this opinion.
[3] For a thorough discussion of the "governmental plan" exception and the cases and interpretive releases analyzing it, see RIAEmployment Coordinator, ¶ B-10,131 to B-10,133, at 30,115-118.