744 So.2d 871 (1999)
Ex parte HOUSEHOLD RETAIL SERVICES, INC.
In re Kathleen Cosby and Eugene Cosby
v.
Household Services, Inc., et al.
1970473.
Supreme Court of Alabama.
October 1, 1999.
*873 Richard S. Manley of Manley, Traeger, Perry & Stapp, Demopolis; and Andrew J. Noble III and Norman Jetmundsen, Jr., of Bradley, Arant, Rose & White, L.L.P., Birmingham, for petitioner.
Andrew P. Campbell and Charles A. McCallum III of Campbell, Waller & McCallum, L.L.C., Birmingham; Robert G. Methvin, Jr., Birmingham; Phillip W. McCallum of McCallum & Associates, Birmingham; and J.L. Chestnut of Chestnut, Sanders, Sanders & Pettaway, Selma, for respondents.
LYONS, Justice.
Household Retail Services, Inc. ("HRS"), the defendant in an action pending in the Marengo Circuit Court, seeks a writ of mandamus directing that court to vacate its October 29, 1997, order, certifying a statewide class of plaintiffs as to certain claims. We grant the petition and issue the writ.

I. Introduction
Kathleen Cosby and her husband, Eugene Cosby, acting individually and "on behalf of all Alabama residents who are similarly situated," sued HRS; Joe Porter, HRS's marketer for the sale of satellite systems to Alabama residents; and several fictitious parties, alleging breach of contract, fraud, suppression, deceit, and conspiracy. In their complaint, the Cosbys alleged the following:
"Defendant HRS is in the business of financing certain household and consumer goods, such as satellite systems. HRS has financed the sale of satellite systems to residents of the State of Alabama, including residents of Marengo County, Alabama.
"In connection with the financing of satellite systems, HRS designed and implemented a scheme, course and conspiracy to finance satellite systems without the knowledge, consent or approval of residents in the State of Alabama. In order to carry out this course, scheme, and conspiracy, HRS entered into arrangements with marketers of satellite systems, such as Porter, wherein marketers would solicit Alabama residents to purchase satellite systems. As part of the marketing and solicitation, Alabama customers, including the Plaintiff[s] here, would not be advised or informed that HRS would finance the satellite system; that hidden charges would be made on finance accounts; and that credit cards would be issued by HRS to purchasers of satellite systems. HRS conducted this scheme to defraud its customers, including the Plaintiff[s] and members of the class, to increase its profits by not disclosing and then assessing its customers with hidden charges and fees."
(Complaint, p. 3.)
The Cosbys moved for a class certification. In support of their motion, they presented evidence tending to show the following: HRS, several distributors of satellite systems, and other financing companies *874 knowingly engaged in a purposeful scheme of conduct to defraud over 9,000 Alabama residents who purchased satellite systems from 1990 to 1996. HRS, the distributors, and the other financing companies designed and carried out a plan by which the distributors' salespersons would solicit rural, low-income, uneducated residents of Alabama and attempt to sell them satellite systems. If the prospective buyer agreed to purchase a satellite system, the salesperson would take a credit application to determine whether the transaction could be financed.
Each credit transaction was part of a financing plan developed by HRS, and someone in HRS's home office either approved or disapproved the applications of the prospective purchasers. The financing plan provided that HRS would issue the purchaser a private-label credit card. The purchaser then received monthly billing statements as if the satellite system had been purchased by the credit card. HRS, the distributors, and the other financing companies chose this financing arrangement in an attempt to be exempt from certain disclosure requirements of the Federal Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and its implementing regulations, 12 C.F.R. § 226 et seq.
The TILA defines two kinds of credit: "open-end credit" and "closed-end credit." See 12 C.F.R. § 226.2 (1999). Creditors entering into "closed-end credit" transactions with consumers must disclose, among other things, (1) the number of payments to be made on the loan; (2) the amount of each monthly payment on the loan; (3) the amount financed; (4) the total finance charge; (5) the total payments; and (6) the total sale price. See 12 C.F.R. § 226.18 (1999). Creditors entering into "open-end credit" transactions with consumers through credit or charge cards, however, need not disclose the total number of payments to be made, the amount of each monthly payment, the total payments, or the total sale price. See 12 C.F.R. § 226.5a (1999). Thus, disclosure requirements for "open-end credit" or charge-card transactions are not as stringent as the disclosure requirements for "closed-end credit" transactions.
For an arrangement to qualify as an "open-end credit" arrangement, the TILA requires a reasonable contemplation of "repeated transactions" by the consumer. 12 C.F.R. § 226.2(a)(20) (1999). HRS and the other finance companies attempted to make their credit arrangements with Alabama satellite purchasers appear to be "open-end credit" arrangements by issuing credit cards to the purchasers. In doing so, HRS and the other distributors sought to avoid the TILA's more stringent disclosure requirements for "closed-end credit." However, these credit cards could be used only for purchases from HRS's merchants or its representatives. The credit-card purchases were also limited to programming fees, upgrades, credit life insurance, and other services strictly related to the use of the satellite system. Furthermore, the credit limit on the credit cards was usually only slightly higher (and in some cases lower) than the cost of the satellite system. Thus, the transaction was not an "open-end credit" transaction because HRS knew that there could be no "repeated transactions" under the financing agreement. Accordingly, HRS was required to, but did not, disclose the material information that should have been provided to customers in "closed-end credit" transactions.
As for the transaction that led to the basis of their individual claims, the Cosbys presented evidence indicating that in July 1994, Joe Porter, a satellite-system salesman, visited their home and made a presentation that resulted in their purchasing a satellite system. Mr. Cosby testified that he did not remember anything Porter said about the price of the satellite system, the method of financing, or the amount of monthly payments, interest, and finance charges. Mr. Cosby also testified that he signed the purchase-agreement documents, *875 but that his signature on the financing agreement was forged. Mrs. Cosby testified that she did not read or sign any of the documents relating to the purchase of the satellite system, but she said that Porter told her that the system would cost $65 per month for 5 years and that this amount included interest, finance charges, and insurance. Because Mrs. Cosby did not sign any of the documents relating to the purchase, or the financing, of their satellite system, the account was opened in her husband's name.
At some time later, HRS purchased Mr. Cosby's account from Southeastern Cable, the distributor for which Porter was a salesman. The amount of the account was $3,390.77. When Mrs. Cosby received HRS's first bill, which was more than $65, she realized that Porter had misrepresented the terms of the financing agreement. She attempted to get HRS to lower her payment, and when it refused she stopped making payments.
The Cosbys' evidence indicated that HRS then attempted to collect the remaining balance from the Cosbys. Mrs. Cosby testified that she received several threatening and harassing telephone calls from HRS. She testified that because of these telephone calls, she accepted HRS's offer to settle the account for $2,000. The Cosbys borrowed $2,000 from a bank and paid that amount as payment in full on the account, and they kept the satellite system.
As to their suppression claim, Mrs. Cosby testified that if Porter had disclosed the proper terms of their financing agreement, i.e., that it would require payments greater than $65 a month and a time longer than 5 years to pay off their debt, they would not have purchased the satellite system. As to her responsibilities as a class representative, Mrs. Cosby knew what relief (rescission and restitution) she and her husband sought on behalf of themselves and the class. She also knew the nature of the claims she had made. She stated that she was aware that her lawyers had agreed to pay her legal expenses and that it was her duty to act in the best interest of the class. Although Mr. Cosby testified that he was not aware of the nature of the claims he had made, both Mr. and Mrs. Cosby testified at length as to their willingness to devote time and effort to see that all class members received the relief sought.
Based on this evidence and other evidentiary submissions, the trial court entered an order certifying the action under Rule 23(b)(3), Ala. R. Civ. P., as a class action involving "[a]ll residents of the State of Alabama from 1990 to 1996 who entered into a transaction for the purchase of a satellite system that was financed by [HRS] by the issuance of a charge or credit card." The trial court certified a class action on the claims of breach of contract, fraud, suppression, and conspiracy. It did not mention the deceit claim in its order. HRS then filed this petition, challenging the certification of the fraud, suppression, and conspiracy claims. HRS did not in its petition challenge the certification of the breach-of-contract claim; therefore, we do not address the certification of a class action on that claim.
A petition for a writ of mandamus is the proper method by which a party may seek review of an order certifying a class action. Ex parte Gold Kist, Inc., 646 So.2d 1339, 1340 (Ala.1994). Nevertheless, a writ of mandamus, being a drastic and extraordinary remedy, is appropriate only when the petitioner has demonstrated the following: (1) a clear legal right to the relief sought; (2) an imperative duty on the respondent to perform, accompanied by a refusal to do so; (3) an absence of another adequate remedy; and (4) properly invoked jurisdiction of the court. Id. at 1341. We will not disturb a trial court's order certifying an action as a class action, absent an abuse of discretion by the trial court. Ex parte Holland, 692 So.2d 811, 814 (Ala.1997).
Initially, "[i]n order to obtain class certification, the plaintiff must establish all *876 the criteria set forth in Rule 23(a) and one of the criteria under Rule 23(b)." Ex parte Gold Kist, 646 So.2d at 1341.
"Rule 23(a) provides four prerequisites to bringing a class action: 1) the class must be so numerous that joinder of all members is impracticable; 2) there must be questions of law or fact common to the class; 3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and 4) it must appear that the representative parties will fairly and adequately protect the interests of the class.
"Rule 23(b) provides as follows:
"`An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
"`(1) the prosecution of separate actions by or against individual members of the class would create a risk of
"`(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
"`(B) adjudications with respect to individual members of the class which would as a practicable matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
"`(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
"`(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.'"
Id. Once the trial court enters an order certifying the action as a class action, a party seeking to have that order set aside bears the burden of demonstrating that the trial court abused its discretion in entering the order. Id.
HRS argues that the trial court erred in finding that the Cosbys had satisfied the requirements of Rules 23(a) and 23(b)(3). HRS maintains that the Cosbys did not present sufficient evidence to satisfy the requirements of these rules, and, therefore, that the trial court should not have certified the action as a class action. Specifically, HRS contends that the Cosbys did not produce sufficient evidence showing that their claims are typical of the members of the class they seek to represent and that they did not produce sufficient evidence showing that they are adequate class representatives, as required by Rule 23(a). Also, HRS contends that the Cosbys did not produce sufficient evidence to support a finding that common questions of fact or law predominate and that a class action is superior to other methods of adjudication, as required by Rule 23(b)(3).
At the outset, we note that an abuse of discretion in certifying a class action may be predicated upon the petitioner's showing that "the party seeking class action certification failed to carry the burden of producing sufficient evidence to satisfy the requirements of Rule 23." Ex parte Green Tree Financial Corp., 684 *877 So.2d 1302, 1307 (Ala.1996). Thus, we must consider the sufficiency of the evidence submitted by the Cosbys. Because we conclude that the Cosbys did not produce sufficient evidence to satisfy the requirements of Rule 23(b)(3), we do not address HRS's arguments regarding the requirements of Rule 23(a).

II. Rule 23(b)(3)
To have a class certified under Rule 23(b)(3), the plaintiff must produce evidence of the following:
"[T]hat the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. To make this determination of `predominance' and `superiority,' the trial court should consider:
"`(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.'"
Ex parte Green Tree Financial Corp., 723 So.2d 6, 9 (Ala.1998) (quoting Rule 23(b)(3)). Furthermore, we held in Green Tree:
"In determining whether the questions of law or fact common to the class members predominate over those questions that affect only individual class members, the court must initially identify the substantive law applicable to the case and identify the proof that will be necessary to establish the claim."
Id.
The trial court certified a class on the Cosbys' claims of breach of contract, fraud, suppression, and conspiracy. Before addressing the elements of fraud, suppression, and conspiracy (the only claims as to which HRS's petition challenges the certification), we note that this action was filed before this Court decided Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997). Thus, in our analysis we must apply the old "justifiable-reliance standard" established in Hickox v. Stover, 551 So.2d 259 (Ala.1989).

A. Fraud
Under Hickox, the elements of a fraud claim are: (a) that the defendant made a false representation concerning a material fact; (b) "which (1) the defendant [either] knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling [the] plaintiff that [the] defendant had knowledge that the representation was true while not having such knowledge"; (c) which the plaintiff justifiably relied upon; and (d) "damage to the plaintiff proximately resulting from his reliance." Cato v. Lowder Realty Co., 630 So.2d 378, 381 (Ala.1993) (citations omitted) (internal quotation marks omitted).
Whether a fraud claim is suitable for class-action treatment depends on the degree of similarity between the representations made to the class members. See Grainger v. State Sec. Life Ins. Co., 547 F.2d 303, 307 (5th Cir.1977); Ex parte AmSouth Bancorporation, 717 So.2d 357, 363-64 (Ala.1998) (per curiam, three Justices concurring and five Justices concurring in the result); see, also, Advisory Committee's Note to Rule 23(b)(3) (on 1966 amendments to rules), Fed.R.Civ.P. ("a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed"). Courts have often found that cases involving written misrepresentations distributed to all members of the class are suitable for class treatment. See, e.g., Heastie v. *878 Community Bank, 125 F.R.D. 669 (N.D.Ill.1989).
On the other hand, "[c]ourts have generally denied certification of [classes involving claims based on] oral communications because of the highly individualized nature of the statements between class members and defendants." Kaser v. Swann, 141 F.R.D. 337, 339 (M.D.Fla. 1991) (citing Seiler v. E.F. Hutton & Co., 102 F.R.D. 880, 884 (D.N.J.1984)). A plaintiff can, however, have a class action certified on fraud claims based on oral misrepresentations by showing that the oral misrepresentations were uniform, e.g., were part of a standardized or "canned" sales pitch. Grainger, supra, 547 F.2d at 307; Compact Electra Corp. v. Paul, 403 N.Y.S.2d 611, 612, 93 Misc.2d 807 (Sup.Ct. App. Term 1977) (in an action for breach of a retail installment contract for the purchase of a vacuum cleaner, the defendant buyer could convert her counterclaim alleging fraud to a class action, when a common course of conduct by salespersons pursuant to training or canned techniques taught by plaintiff would be a "common strand of misrepresentation" running through all sales).
In cases involving a mix of both oral and written misrepresentations, courts generally find that the claims of the class members are not sufficiently similar to allow class treatment. See Kaser, supra, 141 F.R.D. at 339. However, class treatment of claims involving both oral and written misrepresentations can be appropriate when the plaintiff demonstrates (1) that no material variation exists among the oral statements made to the class and (2) that no material variation exists between the oral and written statements. See Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 724 (11th Cir.1987); Grainger, supra, 547 F.2d at 307.
The present case involves a mix of both oral and written representations. According to the Cosbys, Joe Porter and other salespersons visited the homes of the class members and orally communicated to them the terms of the satellite purchase and the financing arrangement. These salespersons also gave the class members written financing agreements, which the Cosbys say each class member entered into. The Cosbys maintain that the oral representations made by the salespersons and the written representations, i.e., the representations in the financing documents, were false. They say that the salespersons misrepresented the term of the loans, the number of monthly payments required to retire the loans, and the finance charges for the loans. The Cosbys say that they and the members of the class relied to their detriment on these representations by entering into the financing agreements.
HRS, however, maintains that individual issues of fact predominate throughout these claims, because, it says, the members of the class dealt with many different salespersons, who worked for many different satellite dealers. HRS contends that the discussions these salespersons had with the class members varied, and the Cosbys have not contradicted it on this point.
Although the Cosbys did present evidence indicating that Porter misrepresented the terms of the financing agreement to them and that HRS and other financing companies conspired to avoid the disclosure requirements of the TILA, the Cosbys did not produce evidence indicating that the oral representations made to the class members were standardized, i.e., were part of a uniform sales pitch. In fact, the Cosbys have not argued that HRS engaged in a course of conduct involving standardized misrepresentations. Instead, the Cosbys maintain that HRS "did, in fact, engage in a fraudulent scheme to avoid disclosure [of the true terms of the financing agreement]." (Respondent's Brief, p. 24.) While this evidence is relevant to an analysis of the Cosbys' fraudulent-suppression claim, it does not satisfy the uniformity requirement of Kirkpatrick, *879 supra, and Grainger, supra. Accordingly, we hold that the trial court should not have certified a class action under the Cosbys' fraud claim.

B. Suppression
The Cosbys also sought to have their action certified as a class action on their suppression claim. They say that they presented evidence indicating that, under the TILA, HRS was required to disclose the actual terms of the financing agreements and that they presented evidence indicating that HRS, the distributors of satellite systems, and other financing companies engaged in a scheme to conceal the true terms of the financing agreements. The Cosbys maintain that they presented evidence indicating that this concealment induced each class member to enter into the financing agreement.
The elements of fraudulent suppression are: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result of acting or of not acting. Booker v. United Am. Ins. Co., 700 So.2d 1333, 1339 (Ala. 1997); Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1293 (Ala.1993). Although the term "inducement" has often been used in the description of the fourth element of suppression, it is clear that a plaintiffs "justifiable reliance" (or, today, "reasonable reliance") is an essential element of a suppression claim. See Liberty Nat'l Life Ins. Co. v. Sherrill, 551 So.2d 272, 273 (Ala.1989). As stated earlier, we apply the justifiable-reliance standard in this case.
HRS does not challenge the sufficiency of the evidence as to elements (1), (2), and (3) of the suppression claim.[1] Instead, it argues that the individual issues of reliance predominate over any issues common to the class. It maintains that a "trial of this case would require that each class member's situation be examined." (Petitioner's Brief, p. 26.) This examination, HRS says, would require the court to inquire whether the class members were induced to act by the nondisclosure or whether the class members knew the true nature of the credit. HRS contends that these individual fact questions regarding each class member's reliance predominate and that the examination into each class member's background, knowledge, and understanding would make the claim unmanageable as a class action.
The Cosbys respond by citing 1 Herbert Newberg and Alba Conte, Newberg on Class Actions § 4.26, p. 4-104 (3d ed.1992), which states, in pertinent part:
"Challenges based on statutes of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability."
The Cosbys also contend that reliance is not an element of suppression. As stated above, under Alabama law reliance is an element necessary to establish liability for suppression, and we therefore turn to the issue whether the individual issues of fact in regard to the element of reliance predominate over any common issues of fact.
The Cosbys correctly note that some courts have certified fraud class actions *880 involving issues of individual reliance. See, e.g., Johns v. Rozet, 141 F.R.D. 211, 218 (D.D.C.1992); In re ORFA Securities Litig., 654 F.Supp. 1449 (D.N.J.1987). Generally, courts have dealt with fraud class actions in one of three ways. First, some courts have found that the solution in actions involving individual questions of reliance "is to bifurcate the action and proceed to trial on all the common elements and then, if necessary, have individual trials on the reliance issue." Tucker v. Arthur Andersen & Co., 67 F.R.D. 468, 477 (S.D.N.Y.1975) (following Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir.1968); see, also, In re Southeast Hotel Properties Ltd. Partnership Investor Litig., 151 F.R.D. 597, 605 (W.D.N.C.1993) (employing the bifurcation method)). Second, other courts prohibit certification of all "class actions seeking relief from separate contracts on the basis of fraud, whatever the genesis of the fraud," on the basis that "`[w]hat one person may rely upon in entering into a contract may not be material to another purchaser.'" Humana, Inc. v. Castillo, 728 So.2d 261, 264 (Fla.Dist.Ct. App.1999) (following a long line of Florida Supreme Court authority). Third, other courts examine the issue under the guidelines laid out in the Advisory Committee Notes to Rule 23(b)(3) (on 1966 amendments to rules), Fed.R.Civ.P.:
"[A] fraud perpetrated on numerous persons by use of similar misrepresentations may be an appealing situation for a class action.... On the other hand, ... a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the person to whom they were addressed."
See, e.g., Rodriguez v. McKinney, 156 F.R.D. 112, 115-16 (E.D.Pa.1994); Republic Nat'l Bank of Dallas v. Denton & Anderson Co., 68 F.R.D. 208, 215-16 (N.D.Tex.1975).[2]
Considering first the bifurcation solution, we note that this approach has been applied in class actions involving mass environmental torts. See, e.g., Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir.1988). This Court cited Velsicol with approval in Ex parte Russell Corp., 703 So.2d 953 (Ala.1997). In Velsicol, the court held that a district court may certify a class action when the factual and legal issues of the defendant's liability are common, even though individualized issues of damages exist. 855 F.2d at 1196-97. The court held that the procedure in such a class action would be to try the issue of liability as a class action and then reserve the issue of damages for individual treatment. Id.
However, Velsicol is not instructive in this case. Velsicol was not a fraud case, but this one is and in it reliance is an element that must be proved to establish liability. See Liberty Nat'l Ins. Co. v. Sherrill, supra. Therefore, we must still determine whether the proof necessary to show reliance is so individualized that the issue of reliance predominates over any common questions of fact.
The process of bifurcating so as to treat reliance on an individual basis has been criticized. One court has stated:
"[Bifurcation] merely delays resolution of the problem until a later date. But this delay in effect prohibits the court from affirmatively finding that the cause is manageable as a class action as required by Rule 23(b)(3)(D)[, Fed.R.Civ. *881 P.]. That is, if actual individual reliance in its common law sense need be proved by each class member, the trial of that issue, even at a later stage in the proceedings, would tax the court's (and counsels') resources to an intolerable extent. Accordingly, the court is constrained to deal with the reliance enigma at the outset in [determining] whether a class should be certified."
In re Memorex Security Cases, 61 F.R.D. 88, 98 (N.D.Cal.1973) (a securities-fraud case). We agree with the Memorex court and hold that the issue whether proof of reliance involves so many individual questions of fact that the individual questions of fact predominate should be addressed at the initial stage of the proceeding.
As noted above, two other schools of thought exist as to whether proof of reliance raises too many individual questions of fact to certify a fraud action as a class action. One school prohibits the certification of fraud class actions, and the other examines the facts of each case according to the applicable rule of civil procedure.
Without addressing the issue of classaction treatment of the issue of reliance, this Court has affirmed the certification of fraud class actions. See Warehouse Home Furnishing Distributors, Inc. v. Whitson, 709 So.2d 1144 (Ala.1997); Ex parte Gold Kist, 646 So.2d 1339 (Ala.1994); Harbor Ins. Co. v. Blackwelder, 554 So.2d 329 (Ala.1989). Significantly, in Harbor Insurance Co., this Court held that "[w]here plaintiffs allege and prove a standard claim for fraud based on misrepresentations with a common thread, as is the case here, their cause is maintainable as a class action." 554 So.2d at 335. But, in Butler v. Audio/Video Affiliates, Inc., 611 So.2d 330 (Ala.1992), this Court affirmed the denial of certification in a fraud class action, where the denial was based, in part, on varying oral representations that created too many individual issues of reliance and damages. Butler, 611 So.2d at 332. The differences in these cases indicate that this Court has not thus far adopted a blanket prohibition against the certification of a fraud class action. Therefore, as with other courts that have addressed the issue, we must consider whether proof of reliance in this case involves predominating individual issues of fact. In so doing, we use the same standard as the federal courts, i.e., whether there "was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Advisory Committee Notes to Rule 23(b)(3) (on 1966 amendments to rules), Fed.R.Civ.P.
Although, by its nature, this suppression claim cannot be based on any affirmative misrepresentations, Mrs. Cosby's testimony indicates that the salesman did make oral representations to her during his presentation to the Cosbys. According to the evidence presented by the Cosbys, a salesperson visited each class member and made mixed oral and written representations. In connection with the Cosbys' fraud claim, they did not produce sufficient evidence indicating that these representations were standardized. Thus, class members very well might have relied on these varying representations instead of the alleged nondisclosure. Of course, the class members might not have relied on the representations but instead on the nondisclosure. The point is that we do not know what the class members relied upon, and, therefore, do not know whether the kinds of reliance varied from class member to class member. The Cosbys were apparently unable to produce evidence indicating that the various forms of reliance by each class member did not materially vary, as it was their initial burden to do in order to establish that common questions of fact predominate.
As noted above, the general rule is that common questions of law or fact cannot predominate where oral representations are at issue. In this case, oral representations may have played, and apparently did play, a major role in the class members' decisions to purchase satellite systems. The only way to know is to require each *882 class member to come to court and testify as to his or her reliance. To do that would make this action unmanageable as a class action.
Moreover, the justifiable-reliance standard is not an objective standard. Instead, the issue whether a plaintiff justifiably relied on the defendant's action (or, in this case, the defendant's lack of action) must be judged according to "`the particular facts of [the plaintiff's] knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications.'" Hickox v. Stover, 551 So.2d at 263 (Ala.1989) (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989) (Hornsby, C.J., concurring specially)).[3] Thus, to determine whether the Cosbys or any other class member justifiably relied on HRS's omissions, a factfinder would have to examine the knowledge and understanding of every class member. The degrees of reliance may have materially differed because, for example, some of the class members may have known the true nature of the credit and, knowing it, may have chosen to purchase the satellite system anyway.
Although the Cosbys produced evidence indicating that the defendants targeted low-income persons in rural areas of Alabama, they have cited no case in which a court has considered evidence of the demographics of a class in determining whether common issues of fact as to reliance predominate in a common-law-fraud action. Moreover, this evidence does not indicate what the class members knew about the transactions. As noted above, the only way to prove the subjective reliance of each class member would be to have thousands of "minitrials," and this would make the class action unmanageable. Accordingly, we hold that the trial court should not have certified the Cosbys' suppression claim as a class-action claim.
In so holding, we note that the putative class members are not without a remedy. A federal court has certified a class action against HRS based on alleged TILA violations, an action in which the class members may be able to recover statutory and actual damages. See Perry v. Household Retail Services, Inc., 180 F.R.D. 423 (M.D.Ala.1998). Moreover, the putative class members can pursue individual claims, subject to available defenses, against HRS, the distributors, and the other financing companies. Thus, the decertification of this class does not foreclose the putative class members' right to pursue individual claims.

C. Conspiracy
Because the plaintiffs' fraud and suppression claims are not suitable for class treatment, the plaintiffs cannot maintain a class action on their conspiracy claim. See McLemore v. Ford Motor Co., 628 So.2d 548, 550-51 (Ala.1993) (holding that when an "underlying cause of action [for fraud] is not viable, the civil conspiracy claim must also fail," 628 So.2d at 551).

III. Conclusion
We grant the petition for the writ of mandamus and direct the circuit court to vacate that portion of its order certifying the claims of fraud, suppression, and conspiracy as a class action under Rule 23(b)(3), Ala. R. Civ. P.
WRIT GRANTED.
HOOPER, C.J., and HOUSTON, SEE, BROWN, and JOHNSTONE, JJ., concur.
MADDOX, J., concurs specially.
*883 MADDOX, Justice (concurring specially).
I agree that the writ of mandamus should be issued and the order of the trial court certifying the class vacated. I opined some 29 years ago, when the law on class-action treatment of consumer-protection issues was in the formative stage, that a class action is not the appropriate vehicle for redress in particular cases. See Taylor v. Major Finance Co., 289 Ala. 458, 268 So.2d 738 (1972) (Maddox, J., concurring specially on overruling of application for rehearing). Specifically, where allegations of fraud are involved, class treatment of such issues is generally not appropriate. In Taylor, I explained:
"The class action ... has received attention in the consumer credit field as being the appropriate device to close the shops of the loan sharks....
"The question, as I view it, is as follows:
"Can individual plaintiffs maintain a class action to recover damages, penalties and attorneys' fees, authorized under the Alabama Small Loans Act [based upon claims of fraudulent conduct], not only for themselves but for all those similarly situated?
"... I do believe that ... this plaintiff should not be permitted to maintain a class action under the facts of this case."
289 Ala. at 463, 268 So.2d at 743.
Because the claims in this case are based upon allegations of fraud, just as the underlying claims in Taylor were, a class action is not the appropriate remedial device. Where the representations made to the plaintiffs were not uniform and share no common strand, class treatment of the claims is not appropriate. The many variables involved prevent class treatment of such issues in this case. I also see a major problem here with the fact that the Cosbys have already settled their claim. Therefore, I agree that the class should be decertified.
JOHNSTONE, Justice (concurring).
I concur. But I do not think HRS should be heard to complain later about being punished multiple times for the "same conduct" in the multiple individual suits that this decision will require.
NOTES
[1] According to the Cosbys' evidentiary submissions to the trial court, at least some of the satellite-system salespersons were instructed as follows:

"Do not disclose any term lengths or `pay off' information to the customers. The program is a revolving credit program that allows customers to make additional purchases on the account. It is not an installment (closed-end) contract."
(Respondent's Ex. 5, "Dealer Instruction Manual") (emphasis in original).
[2] To avoid the problem created by individual issues of reliance in a fraud class action, some plaintiffs have argued that courts should adopt a "presumption-of-reliance" or "fraudon-the-market" theory (used in some federal securities-fraud cases) in common-law-fraud class actions. The California Supreme Court fully addressed and explained this theory, and rejected it, in Mirkin v. Wasserman, 5 Cal.4th 1082, 858 P.2d 568, 23 Cal.Rptr.2d 101 (1993). Moreover, this Court has rejected the same theory. Ex parte Exxon Corp., 725 So.2d 930, 933 n. 3 (Ala.1998) (citing Butler v. Audio/Video Affiliates, Inc., 611 So.2d 330 (Ala.1992)).
[3] Compare this standard with the "reasonable-reliance" standard used in Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983), in which this Court stated: "If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." 438 So.2d at 759.