[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1090 
Alfa Life Insurance Corporation ("Alfa") appeals from a class- certification order obtained by Robert Hughes, Donald Cline, Tom Dake, and Patti Dake, present policyholders of Alfa life-insurance policies (hereinafter referred to collectively as "the plaintiff policyholders"). We vacate the class-certification order and remand.
 I. Factual Background
The plaintiff policyholders purchased "Whole Life 110"[1] insurance policies from Alfa; the policies were purchased through the "minimum-deposit" payment plan option. The plaintiff policyholders filed a class-action complaint alleging fraudulent misrepresentation, suppression, breach of contract, and negligence and/or wantonness. Specifically, the plaintiff policyholders allege (1) that Alfa induced the plaintiff policyholders to purchase the policies by making fraudulent misrepresentations to them about the payment of the premiums, (2) that Alfa suppressed material information regarding the minimum-deposit payment plan, (3) that Alfa breached its insurance contracts with its policyholders who were using the minimum-deposit payment plan, and (4) that Alfa was negligent *Page 1091 
and/or wanton in training and supervising its agents and in handling the policies placed on the minimum-deposit payment plan.
At the time the minimum-deposit payment plan was created, the Internal Revenue Service allowed a deduction for consumer-loan interest. Under the minimum-deposit payment plan, a policyholder paid premiums on the policy out-of-pocket for at least four of the first seven years, depending on several factors including the age and tax bracket of the insured. The plan then allowed a policyholder to pay the insurance premiums by borrowing against the cash value of the policy. The interest the policyholder paid on the policy loans could be deducted from the policyholder's federal income tax. However, in order for the interest to be tax deductible, the borrowed funds had to pass into the hands of the policyholder. Therefore, the insurer would issue, as a loan on the policy, a check to the policyholder in the amount of the premium due, and the policyholder then would issue a personal check to the insurer to pay the premium.
Alfa began training its agents to offer the minimum-deposit payment plan as one of its payment options. Before Alfa offered the minimum-deposit payment plan, an Alfa policyholder had two payment options — a policyholder either could make continuous premium payments throughout the life of the policy or could choose the early stop premium option ("ESP"). William B. Harper, senior vice president of life and loan operations for Alfa, explained the ESP option:
 "The policyholder[s] paid their premiums for the specified number of years to [early stop premium payment on] the policy. The policy had to be set up where the dividends were used to purchase paid-up additions of life insurance, which is one of the dividend options under this policy contract. After they had paid the specified number of years of premiums then they could request to put the policy on ESP, and at such time [Alfa] would start surrendering part of the paid-up additions of life insurance and using that cash value to continue to pay the premiums going forward to keep the policy in force."
The minimum-deposit payment plan, a variation of the ESP option, which incorporated policy loans as opposed to the use of dividends to pay premiums, was introduced as a third payment option. In its brief to this Court, Alfa included a portion of the materials it used to train its agents in offering the minimum-deposit payment plan, which described the plan as follows:
 "The minimum deposit plan means a concept or method of financing the purchase of cash value life insurance, after meeting certain premium payment requirements, through borrowing from the cash value of the policy to pay premiums and by qualifying the interest payments made on the loans for a deduction on the owner's income tax return. The word plan does not mean plan in the sense of an insurance product, rather it is a concept of paying premiums of a cash value life insurance product.
". . . .
 "If the borrowing is done pursuant to the rules established by the Internal Revenue Service and the caselaw established by the courts is not interpreted to disallow it, the interest paid on the policy loans should be an allowable interest deduction on the individual's tax return."
Alfa contends that its training materials and training sessions "clearly explained that loans against the cash value were utilized in the minimum deposit payment plan." Alfa's Brief at p. 29. However, the parties dispute the uniformity of the training and supervision Alfa provided its *Page 1092 
agents to explain the minimum-deposit payment plan. We therefore address the factual circumstances surrounding the plaintiff policyholders' individual purchases of a Whole Life 110 policy using the minimum-deposit payment plan.
 A. Robert Hughes
Hughes owns and operates a family business as a sole proprietorship. Alfa agent Robert Frazure made a "cold call" to Hughes seeking to sell him a policy, and on October 28, 1982, Hughes purchased a Whole Life 110 policy with a face amount of $75,000 from Frazure. Hughes testified that Frazure showed him the policy and some brochures and told him that he "could pay premiums on [the policy] for four years and then the premiums would be paid from the interest that this money accrued." Hughes also stated that Frazure showed him "some kind of breakdown" relating the policy to Hughes's age and other information. Hughes's insurance application indicated that he chose to utilize the automatic premium loan option, which provided that if Hughes failed to timely pay a premium, then an automatic loan would be taken against the cash value in an amount sufficient to cover the policy premium due.
Hughes paid the premiums for over four years, and in January 1987, his wife sent a note to Alfa requesting that the policy be placed on the minimum-deposit payment plan. Alfa then sent Hughes a letter acknowledging that his policy had been placed on the minimum-deposit payment plan and also sent him a check representing the loan amount. Alfa requested that Hughes forward to it a personal check in the same amount as the enclosed check to be applied toward his annual premium. Thereafter, Alfa received sporadic payments from Hughes. Whenever Hughes did not send in a premium payment, an automatic premium loan was used to pay his premium. Alfa sent notices to Hughes explaining the use of the loans. Hughes testified that he did not receive any of the notices.
Dave O'Neal, the district manager for Alfa, met with Hughes in June 1994 to discuss the minimum-deposit payment plan. O'Neal testified that he understood from his Alfa training that loans on the policy would be used to pay the premiums and that he explained this payment method to Hughes. Hughes's policy is still in force, and the current death benefit is greater than $90,201.
 B. Donald Cline
Cline has a degree from a technical college; he is a production controller at an army depot. On December 29, 1983, Cline purchased a Whole Life 110 policy with a face value of $50,000 from Alfa agent John Scott. Scott and Cline previously knew each other because Scott was Cline's high school football coach.
Cline testified that Scott told him that he could pay the premiums on the policy for four years and that then "the dividends will pay the premiums on the policy." Cline later testified that he could not remember whether Scott told him that dividends or interest would pay the premiums. Cline's application for the insurance was marked to indicate that he chose the minimum-deposit payment option; however, Cline did not ask when he purchased the policy what choosing that option meant. Cline's application was also marked to indicate that he chose the automatic premium loan option. Cline testified that he thought Scott had showed him some documents, possibly an illustration and a copy of the policy. However, Cline also testified that he did not rely upon any of the documents when he purchased the policy.
Scott testified that he understood from his training at Alfa that at a certain point *Page 1093 
loans on the policy amounts would pay the premiums on the Whole Life 110 policies, and he testified that he explained to Cline that Cline would pay the premiums out-of-pocket for four years and that a loan on the policy would pay the premiums thereafter.
After paying his premiums out-of-pocket for four years, Cline telephoned Scott to inquire whether his premiums would begin to be paid out of the cash value of his policy. Scott told Cline that he would have to pay the premiums for six years, not four. Scott testified that two years later he showed Cline an illustration explaining the minimum-deposit payment plan, and at Cline's request his policy was placed on the minimum-deposit payment plan. Alfa sent notices to Cline stating that his annual premium had been paid by a policy loan; however, Cline testified that he was "not sure" whether he received all notices each year. Cline did acknowledge that he received annual statements reflecting that his premium was due. Cline said that when he received those statements, he would telephone Scott, who would then tell Cline that he did not need to pay the premiums because they were being paid by loans. Cline's policy is still in force, and it now has a death benefit in excess of $64,885.
 C. Tom Dake and Patti Dake
Tom Dake has a bachelor's degree in accounting and a master's degree in business administration. In March 1983, the Dakes purchased a Whole Life 110 policy with a face amount of $75,000 from Alfa agent Neil Lord. Tom Dake and Lord knew each other because they had been classmates in a master-of-business-administration program.
Tom Dake testified that Lord told him that he could pay premiums for an undetermined period and that the policy would then "sustain itself from that period forward." Tom Dake also testified that Lord told him that the period during which he would pay premiums would depend on Alfa's earnings and the dividends Alfa paid on the policy. Lord provided Tom Dake with a spreadsheet and his own handwritten notes, in which Lord had written that after the tenth year the policy would become self-sustaining by virtue of its dividends. Lord, who is no longer associated with Alfa, testified that he did not inform the Dakes that the minimum-deposit payment plan used policy loans because he was not trained to describe the plan in such a manner.[2]
The Dakes paid premiums for six years. Patti Dake testified that in February 1989 Lord told her that at that point the policy had become self-sustaining and that she needed to sign some paperwork relating to the self-sustaining aspect of the policy. Although the Dakes did not specifically submit a form requesting the minimum- deposit payment plan, Patti Dake signed a consent form, which provided that the premiums would be paid with the proceeds of the policy by an automatic premium loan. Patti Dake testified that she did not remember this transaction. According to Alfa, the Dakes received loan checks from Alfa; however, the Dakes did not use the loan proceeds to pay the premiums on their policy. Alfa also claims that the Dakes were sent notices indicating that their premiums were being paid by automatic loans as well as notices that explained the dividend and loan interest aspects of the policy. Tom Dake testified *Page 1094 
that he did not understand the notices and that he disregarded them because his agent told him to do so. The Dakes' policy is still in force and it has a death benefit in excess of $92,004.
After the plaintiff policyholders purchased their policies and arranged to pay their premiums pursuant to the minimum-deposit payment plan, the Tax Reform Act of 1986 phased out the deduction for interest on consumer loans. Pub.L. No. 99-514, 100 Stat. 2085 (1986). The plaintiff policyholders contend that this change in the tax laws eliminated the benefits of the minimum-deposit payment plan. On April 2, 1999, the plaintiff policyholders filed their complaint, and on September 21, 2000, they filed a motion for class certification.
A class-certification hearing was held on March 19, 2001. No witnesses testified at the hearing. On January 23, 2002, the trial court entered an order striking 14 of the affidavits the plaintiff policyholders presented as evidence of Alfa's alleged misrepresentations. However, based upon the parties' briefs, other exhibits, and arguments at the hearing, the trial court concluded that the plaintiff policyholders met the requirements of Rule 23(a) and 23(b)(3), Ala.R.Civ.P. The trial court certified the following class:
 "Every present or former Alfa policyholder who purchased a Whole Life 110 policy that has been placed on the Minimum Deposit Option or any beneficiary who received death benefits under a Whole Life 110 policy that had been placed on the Minimum Deposit Option."
The trial court excluded from the class "officers, agents or employees of Alfa or any entity in which Alfa has a controlling interest and members of their immediate family and the legal representatives, heirs, successors-in-interest or assigns of any excluded party."
Alfa appeals pursuant to § 6-5-642, Ala. Code 1975, which authorizes an immediate appeal of a class-certification order.[3]
 II. Standard of Review
"This Court applies an abuse-of-discretion standard of review to a trial court's class-certification order, but we will review de novo the question whether the trial court applied the correct legal standard in reaching its decision to certify a class." Smart Prof'l Photocopy Corp.v. Childers-Sims, [Ms. 1010354, October 11, 2002] 850 So.2d 1245, 1248
(Ala. 2002); Compass Bank v. Snow, 823 So.2d 667 (Ala. 2001).
If the plaintiff policyholders failed to meet the evidentiary burden as required by Rule 23, Ala.R.Civ.P., then we must vacate the class-certification order. Smart, 850 So.2d at 1252. The plaintiff policyholders must establish all of the criteria required in Rule 23(a) and one of the criteria set forth in Rule 23(b). Ex parte Gold Kist,Inc., 646 So.2d 1339, 1341 (Ala. 1994). Rule 23(a) provides:
 "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or *Page 1095 
defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."
The additional Rule 23(b) criteria relied upon in the class- certification order states that the plaintiff policyholders have proven that common questions of law or fact predominate over questions affecting individual members and that the class action is superior to other available methods for adjudicating the controversy. We must determine, therefore, whether the trial court exceeded the permissible limits of its discretion in certifying the class and whether it applied the correct legal standard in reaching its decision to certify the class.
 III. Analysis
Alfa argues that the certification of the class of plaintiff policyholders is improper for several reasons. Because we conclude that the proof essential to support the plaintiff policyholders' claims of misrepresentation, suppression, breach of contract, and negligence and/or wantonness does not satisfy the predominance and superiority requirements of Rule 23(b)(3), we pretermit a discussion of the other issues raised by Alfa.
 A. Predominance
"The predominance requirement `tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"Reynolds Metals Co. v. Hill, 825 So.2d 100, 104 (Ala. 2002) (quotingAmchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)). Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." To determine whether common issues of law or fact predominate in this case, the trial court must examine the plaintiff policyholders' causes of action and consider "`what value the resolution of the class-wide issue will have in each class member's underlying cause of action.'" ReynoldsMetals, 825 So.2d at 104 (quoting Rustein v. Avis Rent-A-Car Sys., Inc.,211 F.3d 1228, 1234 (11th Cir. 2000)). In order to meet the requirement of predominance, the plaintiff policyholders "have the burden of presenting sufficient proof that common questions of law or fact predominate over individual claims." Smart, 850 So.2d at 1249; §6-5-641, Ala. Code 1975.
 i. Fraudulent-Misrepresentation and Suppression Claims
In its certification order, the trial court recognized this Court's reluctance to certify a class action involving allegations of fraud and suppression; however, it concluded that the plaintiff policyholders met their burden of proving the predominance of common issues regarding their fraudulent-misrepresentation and suppression claims:
 "Whether common issues of fact predominate over individual issues regarding the class members' misrepresentation and suppression claims is a more difficult issue. Alfa contends that it is impossible to know what each insured was told about his or her minimum deposit policy, and that the issue of each person's reliance requires an individualized inquiry. Alfa further argues that class treatment is inappropriate because each policyholder's claimed damages would have to be evaluated individually.
 "[The plaintiff policyholders] respond to Alfa's contentions by asserting that there were no material variations in the representations given each class member. Almost all of the minimum deposit policyholders were provided illustrations generated by Alfa which represented that dividends, and not loans, would pay future premiums. The verbal *Page 1096 
misrepresentations, according to the [plaintiff policyholders], were consistent with these illustrations. [The plaintiff policyholders] allege that the suppression claim is also suitable for class treatment because Alfa had a corporate policy of nondisclosure regarding the minimum deposit option. Plaintiffs aver that this uniform failure to disclose is appropriate for class treatment.
 "This Court is very aware of our Supreme Court's reluctance to allow certification of fraud and suppression claims. See, e.g., Ex parte AmSouth Bancorporation, 717 So.2d 357 (Ala. 1998); Butler v. Audio/Video Affiliates, Inc., 611 So.2d 330 (Ala. 1992). Yet this Court is also aware that there is no blanket prohibition against the certification of a fraud class action. See Ex parte Household Retail [Serv.] Inc., [744 So.2d 871, 881 (Ala. 1999)]. The determinative issue is whether there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. Id. at 881, citing Advisory Committee Notes to [Fed.] R.Civ.P.[, Rule] 23(b)(3) (on 1966 amendments to rules).
 "This Court has reviewed the materials submitted by the parties and listened carefully to the arguments of counsel at the class certification hearing. [The plaintiff policyholders] have submitted substantial proof that there was no material variation among the oral statements made to the class and that no material variation existed between the oral statements and written illustrations. Ex parte Household Retail [Serv.] Inc., [744 So.2d at 878], citing Kirkpatrick v. J. C. Bradford Co., 827 F.2d 718, 724 (11th Cir. 1987); Grainger v. State Sec. Life Ins. Co., 547 F.2d 303, 307 (5th Cir. 1977).
 "It is also significant to this Court that this case, having been filed after March 14, 1997, is governed by the reasonable reliance standard. [The plaintiff policyholders] are not required to prove class members' reliance according to a subjective standard; the objective standard described in Torres v. State Farm Fire Casualty Co., 438 So.2d 757
(Ala. 1983), is the standard upon which the class members' reliance can be compared. Cf. Ex parte Household Retail [Serv.] Inc., [744 So.2d at 882]. Because of the applicability of this objective standard, it will be unnecessary to conduct individualized inquiries into each class member's reliance.
 "Due to [the plaintiff policyholders'] evidence presented this Court finds that [the plaintiff policyholders] have met their burden of proving the predominance of certain issues. [The plaintiff policyholders] have offered convincing evidence that representations made by Alfa agents throughout the State were virtually identical because these agents were trained uniformly and were required to utilize uniform sales illustrations. See In re Prudential Ins. Co. of America [Sales Practices Litigation], 962 F. Supp. 450 (D.N.J. 1997); In re New England [Mut.] Life [Ins. Co.] Sales Practices Litigation, 183 F.R.D. 33 (D.Mass. 1998); Security Life of Denver Ins. Co. v. Ferguson, [Ms. 05-98-01738-CV, May 28, 1999] (Tex [Ct.] App. 1999) [not designated for publication]. Alfa will undoubtedly present evidence at trial tending to rebut [the plaintiff policyholders'] proof. Such evidence simply frames issues of fact to be resolved by the jury and in no way undercuts the manageability of the class action procedure.
 "The fact that class members may have sustained various degrees of damage also will not render a class action unmanageable. Varying damage levels *Page 1097 
rarely prohibit a class action if the class members' claims possess factual and legal commonality. Mayer v. Mylod, 988 F.2d 635, 640 (6th Cir. 1993). This Court can certainly design procedures to resolve the issue of damages. See, e.g., Arthur Young Co. v. United States Dist. Ct., 549 F.2d 686, 693-94 (9th Cir. 1977)."
(Emphasis added.)
Alfa claims that the plaintiff policyholders have failed to meet their burden of proving the predominance of common issues of law or fact regarding their fraudulent-misrepresentation claim because, it says, they presented inconsistent testimony of the alleged oral and written misrepresentations by the Alfa agents. Alfa claims that without questioning each class member to determine what questions each class member asked and how each Alfa agent responded to those individualized questions the plaintiff policyholders cannot show that the misrepresentations were uniform. Moreover, Alfa contends that each class member's individual reliance precludes the treatment of the fraudulent- misrepresentation claim as a class action.
The plaintiff policyholders argue that the trial court correctly concluded that individualized testimony is not necessary because, they argue, the misrepresentations of the Alfa agents were uniform. According to the plaintiff policyholders, the class-wide liability issues will focus upon Alfa's management-directed scheme to make misrepresentations and omissions.
To establish the elements of fraudulent misrepresentation the plaintiff policyholders must show: "(1) that the representation was false, (2) that it concerned a material fact, (3) that [they] relied on the false representation, and (4) that actual injury resulted from that reliance."Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580, 581 (Ala. 1994); § 6-5-101, Ala. Code 1975. We have recognized the difficulties posed by the certification of a class when a claim of misrepresentation is involved, with numerous representations and varying degrees of reliance.Ex parte Green Tree Fin. Corp., 723 So.2d 6, 10 n. 2 (Ala. 1998). Even if numerous representations have a "common core," an action may still be unsuited for class-action treatment if material variations exist in the representations or if the degree of reliance varies among the persons to whom the representations were made. Green Tree, 723 So.2d at 10 n. 2 (citing the committee comments, Rule 23(b)(3), Fed.R.Civ.P.).
In Ex parte Household Retail Services, Inc., 744 So.2d 871 (Ala. 1999), persons selling satellite systems visited the homes of potential purchasers. The salespersons orally communicated the purchase terms for the satellite systems and also presented written financing arrangements to the potential purchasers. 744 So.2d at 878. Kathleen and Eugene Cosby, as class representatives, maintained that the salespersons' oral and written representations were false and that they had relied to their detriment on those false representations. 744 So.2d at 878. We recognized the general rule that the individualized nature of oral communications in fraud claims between class members and defendants typically precludes class certification. 744 So.2d at 877. See also Ex parte AmSouthBancorporation, 717 So.2d 357, 363-64 (Ala. 1998).
However, we also stated that a plaintiff can have a class action certified on fraud claims based on oral misrepresentations by showing that the oral misrepresentations were uniform or that they were part of a standardized sales pitch. Household Retail, 744 So.2d at 878. Moreover, "class treatment of claims involving both oral and written misrepresentations can be *Page 1098 
appropriate when the plaintiff demonstrates (1) that no material variation exists among the oral statements made to the class and (2) that no material variation exists between the oral and written statements." 744 So.2d at 878. We held that the trial court should not have certified the Cosbys' fraud claim because the Cosbys did not present evidence indicating that the oral representations were standardized. 744 So.2d at 878-79.
The present case likewise involves a mix of alleged written and oral misrepresentations. The trial court discussed Alfa's written misrepresentations and concluded that almost all of the members of the class were presented with written illustrations that represented that future premiums would be paid by dividends, and not policy loans. The plaintiff policyholders describe the alleged written misrepresentations as ESP illustrations. Harper, Alfa's vice president of life and loan operations, testified that he was aware that Alfa agents presented ESP illustrations to potential policyholders.
However, based upon a review of the record, it is unclear what written misrepresentations were made to the plaintiff policyholders. Hughes testified that he did not know exactly what the documents were that Alfa agent Frazure presented him with, but he did recall receiving an "illustration" in a brochure. Cline testified that at some point he saw an illustration. Pursuant to Alfa's request for production, Cline produced an ESP illustration he had received at some point. Alfa agent Scott testified that he showed Cline an illustration of how the minimum-deposit payment plan worked. The Dakes testified that Lord presented an ESP illustration that included his own handwritten notes. Therefore, it is unclear what standardized written misrepresentations the plaintiff policyholders received.
The trial court found that the oral misrepresentations were consistent with the written ESP illustrations. The record, however, indicates an absence of such uniformity. Alfa agent Frazure told Hughes that after he paid his premiums for four years, his "premiums would be paid from the interest that this money accrued." Alfa agent Scott told Cline that after he paid his premiums for four years, his policy would be self-sustaining through dividends or interest. The Dakes testified that Alfa agent Lord told them that the point at which they could stop paying premiums out-of-pocket depended on Alfa's earnings. The Dakes also testified that Lord told them that their policy would become self-sustaining through dividends. The differences in the experiences of the four named plaintiff policyholders alone illustrates how extensive the individual inquiry would be in determining what representations were made to each class member. The oral misrepresentation claims of the plaintiff policyholders fare no better on the issue of uniformity, thus making it almost impossible to determine if a material variation existed between the oral and written misrepresentations as required under Household Retail, supra.
Although the trial court found that Alfa agents were trained uniformly and were required to use uniform sales illustrations, the record reflects that the training material Alfa used to explain its minimum-deposit payment plan to its agents does not contain a standardized sales pitch. Despite Alfa's continuous opposition to the admissibility of Alfa agent Lord's affidavit as presented by the plaintiff policyholders, the affidavit actually shows that Alfa agents were not instructed to use a standardized sales pitch. Lord testified that he did not inform the Dakes that loans were used to pay policy premiums under the minimum-deposit payment plan because, *Page 1099 
he said, he was not trained to do so. However, Alfa employees O'Neal and Scott testified that they informed Hughes and Cline, respectively, about the loan policy because they had been trained to do so by Alfa. Thus, the record indicates that the Alfa agents' presentations to the plaintiff policyholders were not "virtually identical," as the trial court stated. Instead, the record reveals that the Alfa agents were not uniformly trained to submit a standardized presentation of the minimum-deposit payment plan to potential policyholders of Whole Life 110 policies.
The trial court recognized that Alfa disputed the plaintiff policyholders' view of the evidence of uniformity but attempted to downplay that evidence, as "simply fram[ing] issues of fact to be resolved by the jury and in no way undercut[ting] the manageability of the class action procedure." If such logic were compelling all a plaintiff need do to satisfy the commonality requirement is assert that commonality exists and, if the trial court accepts its assertion over contrary evidence from the defendant, the ensuing trial involving proof of liability specific to each class member would somehow be considered manageable. The United States Court of Appeals for the Seventh Circuit rejected such deference to a plaintiff's view of the evidence in Szabov. Bridgeport Machines, Inc., 249 F.3d 672, 677 (7th Cir. 2001).[4] InSzabo the court held:
 "Certifying classes on the basis of incontestable allegations in the complaint moves the court's discretion to the plaintiff's attorneys — who may use it in ways injurious to other class members, as well as ways injurious to defendants. Both the absent class members and defendants are entitled to the protection of independent judicial review of the plaintiff's allegations."
See also Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 188 (3d Cir. 2001) (recognizing that "`sometimes it may be necessary for the court to probe beyond the pleadings before coming to rest on the certification question. . . . [A]ctual, not presumed[,] conformance with Rule 23(a) remains . . . indispensable.'") (quoting General Tel. Co. of Southwestv. Falcon, 457 U.S. 147, 160 (1982)).
Johnston involved a claim of fraud in the marketing of Cinema Plus, a limited partnership formed to finance the production of motion pictures. The plaintiffs sought to have the action certified as a class action. The district court denied the motion for class certification. 265 F.3d at 181. The court of appeals in Johnston was faced with a situation, similar to the one presented here; it noted "the starkly different accounts of plaintiffs Johnston and Fontaine as to how and why they came to invest in Cinema Plus" and pointed out that "the brokers denied using uniform presentations, and more importantly, there is no evidence that, other than Kaiser and Fontaine's broker, any made the alleged misrepresentation . . . at all." 265 F.3d at 191. Finally, the court observed that "Johnston and Fontaine both testified that if they received written sales information or prospectuses from defendants prior to purchase, they did not rely on them, nor could they recall their substance." 265 F.3d at 191. The court concluded:
 "Here, however, we do not know the content of the individual representations as they were not standard or scripted but were oral and varied. Moreover, we do not know whether or to what extent *Page 1100 
the representations facilitated the sales of Cinema Plus units. In the circumstances, we cannot say `that questions of law or fact common to the members of the class predominate over any questions affecting only individual members.' Rule 23(b)(3)[, Fed.R. Civ. P]."
265 F.3d at 191. We prefer this approach to manageability.
Even if we were to find that the misrepresentations the Alfa agents made to the plaintiff policyholders were uniform, the issue of each class member's "reasonable reliance" precludes class certification of the fraudulent-misrepresentation claim. See Foremost Ins. Co. v. Parham,693 So.2d 409 (Ala. 1997). The plaintiff policyholders contend that there was common reliance by the class members and that "[e]veryone acted the same." Plaintiff policyholders' brief, p. 62 n. 22. The trial court agreed and concluded that because of the objective "reasonable reliance" standard, individualized inquiries would not be necessary. However, a determination of each class member's reliance would require individualized inquiry as to whether that reliance was reasonable "`based on all of the circumstances surrounding [the] transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties.'" Reynolds Metals, 825 So.2d at 108 (quoting Foremost Insurance, 693 So.2d at 421)). Under the rationale ofReynolds Metals and Household Retail, we hold that the trial court should not have certified a class with regard to the fraudulent-misrepresentation claim.
In regard to the plaintiff policyholders' suppression claim, the trial court found that the claim was suitable for class-action treatment because the plaintiff policyholders presented sufficient evidence indicating that Alfa had corporate policy of nondisclosure. The plaintiff policyholders contend that they established that Alfa made materially similar omissions to all class members, including the failure to send the policyholders information about the minimum-deposit payment plan, the failure to inform the class members of the changes in the tax law negating the benefits of the minimum-deposit payment plan, and the failure to warn class members of the substantial taxable gain if they surrendered their policies.
In Compass Bank, supra, the plaintiffs sought to certify a class of customers allegedly harmed by Compass Bank's failure to disclose the order in which it posted a customer's checks. 823 So.2d at 668. The plaintiffs alleged fraudulent suppression; however, we concluded that individual issues predominated over the common questions of law or fact, thus making the class unmanageable. 823 So.2d at 672-74. With respect to the reliance element, we stated:
 "It is clear that here, . . . individual inquiry will be required to determine at the very least what information, if any, each plaintiff customer received about the posting order, [and] the extent to which each plaintiff customer relied on the Compass defendants' alleged failure to disclose its policies. . . ."
823 So.2d at 674.
In the present action, as in Compass Bank, individual inquiries will be required to determine what information regarding the minimum-deposit payment plan was presented to each class member, the extent to which each class member relied upon the oral and/or written information, and whether it was reasonable for each class member to rely upon the alleged misrepresentations of the particular Alfa agent involved. Because reasonable reliance is an "essential element" of suppression, we find that the individual issues of reliance preclude class-wide treatment of *Page 1101 
the plaintiff policyholders' suppression claim. See Household Retail, 744 So.2d at 879.
 ii. Breach-of-Contract Claim
In its certification order, the trial court stated that "the [plaintiff policyholders'] breach of contract claims are capable of common resolution." Alfa contends that the minimum-deposit payment plan is not a contractual arrangement; instead, it argues that it is simply one payment plan among several from which a policyholder may select. Therefore, according to Alfa, any alleged breach arises from the varying oral and written representations of Alfa agents. The plaintiff policyholders, on the other hand, contend that under the terms of the insurance contracts, Alfa was required to provide the plaintiff policyholders with whole life insurance that would become self-sustaining in a certain number of years without the necessity of taking out loans on the value of the policy to pay the premiums on the policy. The plaintiff policyholders argue that they did not get the policy they bargained for because of Alfa's breach.
In order to prove their breach-of-contract claim, the plaintiff policyholders must provide evidence of a valid contract, of their performance under the contract, of Alfa's nonperformance, and of resulting damages. Reynolds Metals, 825 So.2d at 105. In Reynolds Metals, the plaintiffs sought to certify a class of employees who had relied upon a manager's oral promise regarding severance benefits. 825 So.2d at 102-03. The plaintiffs alleged that Reynolds, the defendant company, breached its contract with the employees. 825 So.2d at 101. Reynolds argued that the plaintiff employees had to show, among other things, that the employees uniformly understood and/or interpreted the manager's alleged statement and uniformly relied upon and/or expected the same thing as a result of the alleged statement. 825 So.2d at 106. In rejecting the trial court's class-certification order, we held that Reynolds had demonstrated that individualized evidence from each class member was necessary to determine what contract, if any, existed between the company and each class member. 825 So.2d at 106. The oral representation in Reynolds Metals was between one manager and approximately 279 employees. 825 So.2d at 106. Here, we are faced with various Alfa agents making varying presentations, both oral and written, to each class member.
Moreover, each of the four named plaintiff policyholders requested the minimum-deposit payment plan at different times. Hughes's wife sent a handwritten note requesting to be placed on the minimum-deposit payment plan; Cline signed an application on which "minimum deposit" was marked and then later signed a form requesting the minimum-deposit payment plan; and Patti Dake signed a form requesting that the policy be placed on an automatic payment loan. The circumstances surrounding each contract are different; thus class-action treatment of the plaintiff policyholders' breach-of-contract claim is precluded. See Green Tree, 723 So.2d at 10 (ordering the class-certification order in the plaintiffs' breach-of-contract claim vacated because the claim presented individualized issues of the parties' intent and the course of dealing between the parties).
 iii. Negligence and/or Wantonness Claims
The plaintiff policyholders assert two separate negligence and/or wantonness claims. First, the plaintiff policyholders argue that Alfa negligently and/or wantonly failed to supervise or train its employees in transactions involving the minimum-deposit payment plan as it related to the Whole Life 110 policies. Second, *Page 1102 
the plaintiff policyholders claim that Alfa was negligent and/or wanton in handling the policies placed on the minimum-deposit payment plan. In its certification order, the trial court stated:
 "At the certification hearing, [the plaintiff policyholders] submitted the affidavit of a former Alfa agent who sold the life insurance policy at issue to named [plaintiff policyholders] Tom and Patti Dake. In the affidavit, Neil Lord states that he did not inform the Dakes that policy loans would be used to pay future premiums because he was not trained to describe the minimum deposit policy in that manner. Mr. Lord states that he was trained by Alfa at a scheduled training session to tell policyholders like the Dakes that the number of required premium payments was dependent upon the prevailing interest rate.
 "According to the [plaintiff policyholders], Alfa breached the applicable standard of care in failing to fully inform its agents and employees regarding the material aspects of the minimum deposit payment option. [The plaintiff policyholders] contend that Alfa's desire to sell policies was stronger than its desire to explain the minimum deposit option to its agents and insureds and that, as a result, the company stressed the lower number of required out-of-pocket premiums and did not appropriately explain other material aspects of the payment option. [The plaintiff policyholders] aver that as a result of this alleged failure to train and/or supervise, there has been a systematic failure to disclose material details about this minimum deposit option to the insureds.
 "[The plaintiff policyholders] further allege that Alfa has been negligent and/or wanton in its handling of minimum deposit policies. Specifically, [the plaintiff policyholders] challenge Alfa's allowing policies to be placed on the minimum deposit payment option after the tax laws had changed when it was allegedly contrary to policyholders' best interest. [The plaintiff policyholders] also claim that Alfa has been negligent and/or wanton in its implementation of its alleged plan to protect minimum deposit policyholders. [The plaintiff policyholders] point to evidence that company personnel were not adequately instructed with regard to the company's plan; that lapses of minimum deposit policies were commonplace; that Alfa collected at least $583,447 in additional premiums from minimum deposit policyholders even though the company had allegedly decided not to require such additional premiums; that death claims were not properly paid; and, that minimum deposit policyholders continue to be charged an effective loan interest rate which is greater than that which should have been assessed them according to the original minimum deposit concept.
 "Alabama caselaw is applicable to these negligence and wantonness claims. The proof required to establish Alfa's negligent or wanton training and supervision should be the same for all class members."
Alfa contends that these negligence and wantonness claims are inappropriate for class-action treatment because, it says, the training and supervision of Alfa agents was not uniform. Alfa also contends that each policyholder's plan was handled on an individual basis because a variety of methods was used by Alfa to remedy any problems created by the change in the tax law in 1986.
As we concluded in Part III.A.i., individualized inquiries would be necessary to determine what training each Alfa agent *Page 1103 
received, the extent of his or her supervision, and whether his or her minimum-deposit payment presentation to a potential policyholder was consistent with that training. Moreover, as the plaintiff policyholders point out in their brief to this Court, Alfa dealt with each policyholders' complaint regarding the minimum-deposit plan as it arose. Therefore, we agree with Alfa that the policies "were individually sold by individual agents who had received individual training, and the policies were individually handled according to the particular needs of each policyholder." Alfa's Reply Brief at p. 24.
Individual issues predominate the common issues required to maintain the plaintiff policyholders' negligence and/or wantonness claims as a class action. Without individualized inquiries, the plaintiff policyholders cannot prove the training each Alfa agent received and/or how the agent was supervised, the notice each supervisor had, if any, regarding an Alfa agent's improper presentation of the minimum-deposit payment plan, and each Alfa agent's subsequent handling of each policyholder's plan. See Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256
(Ala. 1998) ("'Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowingof the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."); AALAR,Ltd., Inc. v. Francis, 716 So.2d 1141, 1144 (Ala. 1998) ("The traditional elements of a negligence cause of action are a duty to a foreseeable plaintiff, breach of that duty, causation, and damage."); Lane v. CentralBank of Alabama, N.A., 425 So.2d 1098 (Ala. 1983) (an essential element of negligent supervision is the employer's notice of the employee's improper conduct). We hold that the trial court should not have certified the plaintiff policyholders' negligence and/or wantonness claims as a class action.
 B. Superiority
Rule 23(b)(3) requires a finding that the class action "is superior to other available methods for the fair and efficient adjudication of the controversy." The trial court found that the plaintiff policyholders met the burden of proving the superiority requirement of Rule 23(b)(3):
 "Superiority. Rule 23(b)(3) directs the Court to determine `that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' '[O]ther available methods' necessarily include the individual adjudication of hundreds of individual actions in courts throughout the State. This Court holds that a class action is the superior method of adjudicating this controversy, especially considering the factors enunciated in Rule 23(b)(3)(A)-(D). Any interest of class members in individually controlling the prosecution of separate actions is outweighed by the potential for comprehensive and expedient resolution of this class action. Should any member of the class wish to control the prosecution of his lawsuit, he may opt out of the class. Previous litigation commenced by minimum deposit policyholders has failed to provide relief to class members. Concentration of this litigation in one forum will prevent repetitive pretrial discovery, trial preparation and trials and will prevent inconsistent adjudications. There appear to be no insurmountable difficulties in the management of this case as a class action. Accordingly, this Court finds that the superiority requirement is met."
Because individual issues predominate over the common claims, manageability difficulties render this case unfit for class certification. Reynolds Metals, 825 So.2d at 108. "[T]he greater the *Page 1104 
number of individual issues, the less likely it is that a court may properly find that a class action is the superior means of litigating the plaintiff's claims." Green Tree, 723 So.2d at 9. The individualized inquiry necessary to determine the subjective facts in each transaction pretermits the superiority of any class-wide resolution of these disputes.
 IV. Conclusion
The trial court erred in certifying the class in this case. We vacate its class-certification order and remand the cause for further proceedings consistent with this opinion.
ORDER VACATED; CAUSE REMANDED.
MOORE, C.J., and HOUSTON, LYONS, JOHNSTONE, and WOODALL, JJ., concur.
[1] A Whole Life 110 policy is a "permanent" life-insurance policy; the policy pays dividends as long as it is in force. Premiums for a Whole Life 110 policy are due for the lifetime of the insured.
[2] Alfa objected to the admissibility of Lord's affidavit at the class-certification hearing on the basis that it was inadmissible hearsay and that the plaintiff policyholders failed to disclose to Alfa that Lord's testimony would be used at the hearing. Alfa continues to object to the admissibility of the affidavit.
[3] The plaintiff policyholders contend that we should not address Alfa's appeal of the trial court's class certification as to their breach-of-contract and negligence and/or wantonness claims. See Porterv. Colonial Life Accident Ins. Co., 828 So.2d 907 (Ala. 2002) (holding that this Court will not consider issues raised for the first time on appeal). However, upon a review of the record, we conclude that Alfa addressed both claims before the trial court at the certification hearing, thereby preserving those issues for appeal.
[4]: Federal authority is authoritative in construing the Alabama Rules of Civil Procedure because those rules were patterned after the Federal Rules of Civil Procedure. Cutler v. Orkin Exterminating Co., 770 So.2d 67,70 n. 2 (Ala. 2000).