Alfa Life Insurance Corporation ("Alfa") appeals the denial of posttrial motions for (1) a judgment as a matter of law, (2) a new trial, or (3) a remittitur of the compensatory and punitive damages awarded to the plaintiffs Andy Green and Bonnie Green ("the Greens") on their fraud claims against Alfa. We hold that the Greens failed to demonstrate that their reliance on Alfa's representations to them regarding a whole-life insurance policy was reasonable, and we reverse and remand.
 I. Procedural History
On August 27, 1999, the Greens sued Alfa in the Bullock Circuit Court, alleging fraud, suppression, and negligent or wanton failure to procure insurance. The claims arose out of the Greens' purchase of a $500,000 whole-life insurance policy on Bonnie Green's life.
The Greens voluntarily dismissed their negligence and wantonness claims. On December 14, 2001, the jury returned a verdict for the Greens, awarding them $300,000 in compensatory damages and $3,000,000 in punitive damages. On motion of Alfa, the trial court reduced the punitive-damages award to $900,000 in accordance with Ala. Code 1975, § 6-11-21. On January 14, 2002, Alfa filed a posttrial motion for a judgment as a matter of law, *Page 988 
or, alternatively, for a new trial and a motion seeking a remittitur. The trial court denied all of Alfa's motions. Alfa appeals.
 II. Standard of Review
Regarding the standard of review of a judgment as a matter of law ("JML"), this Court has stated:
 "We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is `indistinguishable from the standard by which we review a summary judgment.' Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala. 2002). In Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala. 2000), this Court stated that `"[s]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."' 791 So.2d at 923 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)).''
Alabama Power Co. v. Aldridge, 854 So.2d 554, (Ala. 2002). The Court must view the evidence most favorably to the nonmovant, in this case the Greens. Glenlakes Realty Co. v. Norwood,721 So.2d 174, 177 (Ala. 1998).
 III. Facts
The following evidence is undisputed. At the time of the events that are the basis for this action Andy Green was 47 years old; he has an eleventh-grade education and can read and write. He owned a tire business in Union Springs for 20 years and owned a hay business for 10 years. He had employed lawyers and what he referred to as a "big accounting firm" that filed his federal income tax returns and did accounting work for him on an annual basis. His wife, Bonnie, who was also 47 years old, has a high-school education, can read and write, and worked as a bookkeeper for 20 years. The Greens, who had four children, wanted to leave each child $125,000, free of estate tax. In 1991, they mentioned this plan to Ben May, their Alfa insurance agent, when he visited them to discuss the renewal of their property and casualty insurance policies. May told the Greens that he knew some people at Alfa who had expertise in estate planning.
Sometime after their conversation with May, the Greens met at the Alfa office in Union Springs with May and "a lawyer representing Alfa, named Steve Hughes." This fact-finding meeting lasted over an hour, with Hughes asking the Greens questions about their financial situation. At the end of the meeting, Hughes told the Greens that he would analyze the information they had given him and would get back with them regarding his recommendations.
The meeting with Hughes and May took place in April 1991, at the Alfa office in Union Springs. What happened at that meeting is disputed in part. It is undisputed that the Greens, Hughes, and May were present and that Hughes presented the Greens with proposals involving two Alfa life-insurance policies. The Greens rejected the first policy immediately because they would have had to pay premiums on the policy for too many years. What is in dispute is whether Hughes misrepresented or suppressed information concerning the second policy to the Greens. The Greens testified that Hughes informed them that the second policy would not require payments after either the seventh or ninth year, but in no case *Page 989 
beyond the ninth year. Hughes testified that he did not explain to the Greens any feature of the life-insurance policy that the Greens ultimately purchased from Alfa, including the vanishing-premium feature.[1]
It is undisputed that the Greens purchased the second policy and that they at least saw the following schedule before they signed the application to purchase the policy or paid any money to Alfa:
 "* * * STATEMENT OF POLICY VALUES * * * "ALFA LIFE INSURANCE CORPORATION "PO Box 11000, Montgomery, Alabama 36198-0101 "INTEREST SENSITIVE PLAN
"FOR GREEN, BONNIE C
 "Age 47 Female Nonsmoker
 "Face Amount: $500000 Annual ISP Premium: $8115.00
 "GUARANTEED PROJECTED VANISH — 8.500% 
"END OF AGE AT ANNUAL SURRENDER DEATH ANNUAL SURRENDER DEATH
YEAR EOY PREMIUM VALUE BENEFIT PREMIUM VALUE BENEFIT
======= ====== ======= ========= ======= ======= ========= =======
" 1 48 8115.00 0 500000 8115.00 0 500000
" 2 49 8115.00 0 500000 8115.00 0 500000
" 3 50 8115.00 2920 500000 8115.00 2920 500000
" 4 51 8115.00 8750 500000 8115.00 8750 500000
" 5 52 8115.00 14795 500000 8115.00 14795 500000
" 6 53 8115.00 21045 500000 8115.00 21587 500000
" 7 54 8115.00 27495 500000 8115.00 32754 500000
" 8 55 8115.00 34160 500000 8115.00 46762 500000
" 9 56 8115.00 44790 500000 8115.00 63944 500000
 *Page 990 
"10 57 8115.00 53997 500000 0.00 72707 500000
"11 58 8115.00 64185 500000 0.00 82294 500000
"12 59 8115.00 75413 500000 0.00 92784 500000
"13 60 8115.00 87726 500000 0.00 104267 500000
"14 61 8115.00 101163 500000 0.00 116845 500000
"15 62 8115.00 115736 500000 0.00 130468 500000
"16 63 8115.00 125178 500000 0.00 138316 500000
"17 64 8115.00 134755 500000 0.00 146588 500000
"18 65 8115.00 144432 500000 0.00 155340 500000
"19 66 8115.00 154202 500000 0.00 164632 500000
"20 67 8115.00 164071 500000 0.00 174388 500000
 "Age 65 8115.00 144432 500000 0.00 155340 500000
 "Age 75 8115.00 247024 500000 0.00 278150 500000"

What other documents, if any, the Greens saw at that meeting before they decided to purchase the policy is disputed. Viewing the evidence in a light most favorable to the Greens, as our standard of review requires, we will assume that the Greens did not see the following language, which appears at the bottom of the Statement of Policy Values, before they received the policy:
 "THE CURRENT VALUES ARE BASED ON OUR DECLARED INTEREST AND COST OF INSURANCE RATES. THESE MAY CHANGE WITH FUTURE CONDITIONS.
 "THE CURRENT VALUES ARE BASED ON AN ANNUAL MODE OF PAYMENT. A MORE FREQUENT MODE OF PAYMENT WILL RESULT IN LOWER VALUES DUE TO INTEREST COMPOUNDING.
 "CURRENT CASH VALUE IN EXCESS OF THE GUARANTEED VALUE MAY BE USED TO PAY PREMIUMS. ON THE GIVEN PROJECTED BASIS, PREMIUMS WOULD NOT BE REQUIRED AFTER THE 9TH YEAR.
 "ADDITIONAL PREMIUM MAY BE REQUIRED TO KEEP THE POLICY IN FORCE IF:
"1) PREMIUMS ARE NOT PAID WHEN DUE, OR
"2) INTEREST PAID IS LESS THAN PROJECTED, OR
"3) COST OF INSURANCE RATES ARE INCREASED."
(Capitalization original.)
In addition, May was present at the meeting.[2] The Greens testified at trial that May had been "up-front" with them in everything he had handled for them, that they had no problem with anything May did in selling the policy, and that the jury should not find May responsible for "some alleged fraud or lying." May testified that he explained the specific policy to the Greens, that he explained to them that if interest rates went up it would take less time "for the policy to pay for itself" and that if the rates went down, "it would take a longer time for the policy to pay for itself." May's presentation to the Greens took 30 minutes. He explained the "Statement of Policy Values" previously set out in this opinion, showing what was guaranteed and what would happen if the interest rate remained at 8.5% (that rate was guaranteed for one year only). May showed *Page 991 
the Greens that if the 8.5% rate remained the same the Greens could discontinue the premium payments after the ninth year. May testified that he thought the Greens understood the way the policy worked. May further testified that he and Hughes answered every question the Greens asked. May testified that he did not represent to the Greens that the policy would sustain itself in seven years or in nine years. The Greens did not take the stand to challenge May's testimony.
After the representations the Greens said that Hughes made to them, the Greens received documents showing that the policy they purchased was an "Interest Sensitive Policy"; that under the column headed "Guaranteed" on the Statement of Policy Values the annual premium for the policy was $8,115 until Bonnie reached age 75; that under "Projected Vanish — 8.500%," the annual premium was $8,115 through the ninth year of the policy. In addition, May had explained to the Greens that if interest rates went down it would take longer than nine years for the policy "to pay for itself." Likewise, May, who was "up-front" with the Greens and with whom they had no problem about anything in selling the policy, was present and answered all questions asked of him by the Greens.
The Greens paid the premiums on the policy for nine years. They were then told that they would have to pay additional premiums. The Greens then sued Alfa.
IV. Analysis
To recover in a fraud action filed after March 14, 1997, a plaintiff must prove that he or she reasonably relied on the defendant's alleged misrepresentation. Foremost Ins. Co. v.Parham, 693 So.2d 409 (Ala. 1997).[3] The reasonable-reliance standard was the law before the release ofHickox v. Stover, 551 So.2d 259 (Ala. 1989), and again became the law for all actions filed after March 14, 1997. This standard was well-stated in Torres v. State Farm *Page 992 Fire Casualty Co., 438 So.2d 757, 758-59 (Ala. 1983):
 "Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. . . .
 "`If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria."'
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
"Although the term `inducement' has often been used in the description of the fourth element of suppression,[4] it is clear that a plaintiff's . . . `reasonable reliance' . . . is an essential element of a suppression claim." Ex parte HouseholdRetail Servs., Inc., 744 So.2d 871, 879 (Ala. 1999).
At the time of or after Hughes made his alleged misrepresentation to the Greens, the Greens were shown a document showing that the policy they were presented with was an "Interest Sensitive Plan"; that the column of the policy headed "Guaranteed" showed that the Greens would have to pay the $8,115 annual premium until Ms. Green was 75 years of age or for 28 years; and that the policy would be paid up in nine years only if the interest rates remained at 8.5%, as indicated in the column headed "Projected Vanish — 8.500%."
In addition, after Hughes made his alleged misrepresentation and before the Greens paid over $700 as an advance on the first premium, May explained the specific policy and explained to the Greens that if interest rates rose, it would take less time "for the policy to pay for itself. If the rates go down, it would take a longer time for the policy to pay for itself." May showed the Greens, using the document set out earlier, that if the interest rate remained at 8.5% the Greens could discontinue the premium payments after the ninth year. As to May, the Greens testified that he was "up-front" with them and that they had no problem with anything May did in selling the policy and that they would not want the jury "to find Ben May responsible for some alleged fraud or lying."[5]
Based upon this evidence, we hold that the Greens have not shown any reasonable reliance by them on anything Hughes said before the Greens paid the partial premium. *Page 993 
It was reversible error for the trial court to refuse to grant Alfa's motion for a judgment as a matter of law. Therefore, we reverse the trial court's order denying the judgment as a matter of law and remand the case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[1] The complaint and the pretrial order cannot be reconciled with the Greens' testimony. The complaint and the pretrial order alleged:
 "5. During this [April 1991] meeting, the [Greens] were told by Alfa's agent, Ben May, that they could purchase a $500,000 whole life insurance policy insuring the life of the Plaintiff Bonnie C. Green by making seven annual premium payments of $8,115 and thereafter there would be no future out-of-pocket premiums required of them because the future premiums would be paid for from the values, earnings and dividends of the insurance policy."
The pretrial order provided:
 "[The Greens] assert that on or about April 17, 1991, Ben May, an agent and/or employee of [Alfa], told the [Greens] that they could purchase a $500,000 whole life insurance policy insuring the life of the Plaintiff Bonnie C. Green by making seven annual premium payments of $8,115 and thereafter no future-out-of-pocket premiums would be required of them because the future premiums would be paid for from the values, earnings and dividends of the insurance policy. Based on these representations the [Greens] purchased a $500,000 whole life policy on the life of Bonnie Green, bearing policy no. L317300. In reliance on the representations of [Alfa], by and through its agent and employee, the [Greens] have made seven years of premium payments equaling $56,805. On the seventh anniversary of the policy, the [Greens] were informed by [Alfa] that they would be required to pay `another two years' because Alfa's investments had not done so well but after two more premium payments the [Greens] would not owe any further premiums. On May 17, 1998, the [Greens] discovered the misrepresentations regarding the insurance plan."
Mr. Green's testimony at trial was that Ben May was a "good guy" and that he had a good reputation in Union Springs. So far as Mr. Green knew, May had been "up-front" with the Greens in everything he had handled for the Greens. Mr. Green would not want the jury "to find Ben May responsible for some alleged fraud or lying." Ms. Green also indicated that she had no problem with anything Ben May did in selling the policy.
Therefore, although the Greens alleged that Alfa's liability was predicated on May's representations, or his failure to convey certain information, to the Greens, the case was tried solely on Alfa's liability to the Greens predicated on Hughes's representations or failure to convey certain information to the Greens.
[2] May testified that Hughes did not say anything misleading or untrue about the policy at their meeting with the Greens; that if Hughes had said something misleading or untrue to the Greens at the meeting, May would have stopped him and asked him to clarify what he had said. Specifically, May never heard Hughes promise the Greens that the policy would be paid up by any particular time. Hughes explained generally how the vanishing-premium option worked, but not as it related specifically to the policy presented to and ultimately purchased by the Greens.
[3] The reasonable-reliance standard was the standard applied by this Court for 140 years before the decision in Hickox v.Stover, 551 So.2d 259 (Ala. 1989). For less than an 8-year period between the decisions in Hickox and Foremost, this Court applied the justifiable-reliance standard in fraud cases, but returned to the reasonable-reliance standard for all actions filed after March 14, 1997. Foremost, supra. The justifiable-reliance standard was first advanced by Chief Justice Hornsby in his special concurrence in Southern States Ford, Inc.v. Proctor, 541 So.2d 1081, 1087 (Ala. 1989):
 "`Reliance' should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully understand the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is `one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.'"
541 So.2d at 1091-92 (Hornsby, C.J., concurring specially).
In his special concurrence in Foremost, Justice See wrote:
 "History demonstrates that severing liberties from responsibilities invites social and legal disorder. . . . Alabama's experience with the `justifiable reliance' standard for fraud is an example of the price paid for severing legal rights from concomitant responsibilities.
". . . .
 "Weighed against the cost of requiring buyers to act as reasonable citizens, the cost of the experiment with `justifiable reliance' has been too high. Unbound by the terms of their contracts, unimpeded by any prospect of summary judgment, and lured by the promise of gain, plaintiffs have choked the courts with a flood of fraud litigation. This serves as an example of the price paid for severing rights from concomitant responsibilities."
693 So.2d at 437-39 (See, J., concurring specially).
[4] "The elements of fraudulent suppression are: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result. . . ."
Ex parte Household Retail Servs., Inc., 744 So.2d 871, 879
(Ala. 1999).
[5] In addition, we note that May personally took the policy to the Greens after it had been prepared. The policy plainly showed that it was an interest-sensitive policy, that the current interest rate was 8.5%, that cash value in excess of the guaranteed value could be used to pay premiums and, on the projected basis, premiums would not be required after the ninth year, and that additional premiums may be required to keep the policy in force if the projected interest fell below 8.5%. The Greens were given 10 days from the delivery of the policy to refuse the policy and to receive a refund of all premiums paid. The Greens did not take advantage of this privilege.