887 So.2d 222 (2004)
LIBERTY NATIONAL LIFE INSURANCE COMPANY
v.
Charles E. INGRAM.
Charles E. Ingram
v.
Liberty National Life Insurance Company.
Nos. 1020911 and 1021032.
Supreme Court of Alabama.
February 20, 2004.
*223 Scott Burnett Smith of Bradley Arant Rose & White, LLP, Huntsville; Kenneth M. Perry and Matthew H. Lembke of Bradley Arant Rose & White, LLP, Birmingham; and Philip H. Butler of Bradley Arant Rose & White, LLP, Montgomery, for appellant/cross-appellee Liberty National Life Insurance Company.
Ernestine S. Sapp of Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee; and S. Sanford Holliday, Roanoke, for appellee/cross-appellant Charles E. Ingram.
SEE, Justice.
Liberty National Life Insurance Company ("Liberty National") appeals from the denial of its posttrial motions for a judgment as a matter of law and for a new trial in an action brought by Charles Ingram alleging, among other things, fraud and suppression. Liberty National also appeals the trial court's remittitur of the compensatory damages and the punitive damages, arguing that the trial court erred when it failed to remit the jury's $200,000 compensatory-damages award to an amount less than $60,000, and when it failed to reduce the jury's $3,000,000 punitive-damages award to an amount less than $180,000. We hold that Ingram's claims are barred by the applicable statute of limitations, and that even if they were not Ingram failed to demonstrate that he reasonably relied on Liberty National's alleged representations to him regarding the insurance policy or that Liberty National suppressed a material fact; therefore, we reverse the trial court's judgment and render a judgment as a matter of law in favor of Liberty National.

I.
On March 19, 1996, Ingram sued Liberty National alleging fraud, suppression, deceit, wantonness, civil conspiracy, bad faith, and conversion in regard to an insurance policy he purchased from Liberty National. The claims arose out of Ingram's purchase of a "LifePlus" policy, which Ingram says he understood would be paid up in 10 years, at which time he would no longer be required to pay premiums on the policy. Liberty National moved to dismiss the action or for a more definite statement. The trial court dismissed Ingram's bad-faith and civil-conspiracy claims, and ordered Ingram to amend his complaint to plead fraud more particularly. Ingram amended his complaint to allege that Liberty National's agent, Jerry Cook, convinced him to buy a $15,000 policy covering the life of his daughter. Ingram further alleged that Cook described the policy as an investment and told him that the policy would be paid up if he paid the premiums for 10 years; he also alleged that Cook suppressed the fact that the interest rate of 9.75% used to arrive at the 10-year *224 period was not a guaranteed rate of interest. Liberty National moved for a summary judgment, arguing that Ingram's claims were barred by the statute of limitations. The trial court denied Liberty National's motion as to the fraud and suppression claims and granted the motion as to the remaining claims.
The case went to trial on September 9, 2002. Liberty National moved for a judgment as a matter of law both at the close of Ingram's case and at the close of all the evidence. The trial court denied both motions. The jury returned a verdict for Ingram, awarding him $200,000 in compensatory damages and $3,000,000 in punitive damages. Liberty National renewed its motion for a judgment as a matter of law, and alternatively moved for a new trial or for a remittitur. The trial court denied Liberty National's motion for a judgment as a matter of law or a new trial, but remitted the compensatory-damages award to $60,000 and the punitive-damages award to $180,000. Liberty National appeals. Ingram cross-appeals, requesting that this Court reinstate the jury's $3,200,000 verdict.

II.
When reviewing a ruling on a motion for a judgment as a matter of law, this Court applies the same standard the trial court used in deciding the motion. Alfa Life Ins. Corp. v. Green, 881 So.2d 987, 988 (Ala.2003). In Green, this Court stated:
"`We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). In Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala.2000), this Court stated that "`[s]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" 791 So.2d at 923 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).'"

III.
In July 1985, Ingram returned home from work and found Jerry Cook, a Liberty National agent, waiting for him. Ingram alleges that Cook represented to him that the policy he was considering was similar to an investment, that it had a fixed interest rate of 9.75%, and that if Ingram paid the premiums for 10 years he would not have to pay any more premiums on the policy. Cook could not recall the specifics of this conversation. Ingram agreed to buy the policy and Cook delivered the policy in August 1985. At that time, Cook again explained the policy to Ingram, using tables that illustrated the projected and guaranteed values of the policy. Although the table reflected both projected and guaranteed values, Ingram alleges that Cook discussed with him only the projected values and that Ingram did know that the values they were discussing were the projected  not the guaranteed  values. Ingram testified as follows:
"Q. Okay. Mr. Cook, when he sold you this Life Plus policy, didn't guarantee you that the 9.75 percent interest would stay at 9.75, did he?
"A. No, sir. He didn't guarantee that it would stay there.
"Q. Right. And, in fact, he told you that the interest rate, that current interest rate could change, didn't he?
"A. I don't  He could have. More, right. You're right. He said 9.75 or more.
"Q. Yes, sir. He also could have told you  Are you denying that he told you that it could also be less that 9.75?

*225 "A. I don't remember him ever saying less.
"Q. But he could have told you less, couldn't he?
"A. Well, he could have. But I said I don't remember him telling me that.
"Q. I understand that. All right, sir. But we know he didn't guarantee it would stay that much?
"A. I didn't say he did."
Ingram also testified that he knew that the illustrations of the value of the policy were dependent upon the 9.75% interest rate.[1] Ingram also admits that he did not read the policy and that he would not have purchased the policy if he had read it. Ingram, since July 1985, has paid, and continues to pay, a monthly premium of $14.55.
Liberty National mailed Ingram yearly reports regarding his policy. The first report indicated that the interest rate had dropped from 9.75% to 7%. The reports Ingram received in 1987, 1988, 1989, and 1990 reflected an interest rate for those years of 8%. Ingram received a report every year thereafter, and the interest rates reflected in those reports varied from 5% to 8%.[2] In August 1995, Ingram received the yearly report on his policy from Liberty National. Liberty National had changed the form of the report; it now included a statement that the premiums were payable for the life of the policy. After reading this statement, Ingram telephoned Liberty National. In response to Ingram's telephone call, Liberty National sent two agents to Ingram's house to discuss the policy with him. Ingram alleges that the agents represented to him that they would "take care of it" and that Ingram did not have to continue paying premiums on the policy. Ingram did not hear from the Liberty National agents again.
In March 1996, Ingram sued Liberty National. He claims that the situation with the policy has made him nervous and caused him to lose sleep. He has not sought professional help for those problems, although he has taken aspirin to alleviate them.
Ingram has the equivalent of a seventh-grade education. He has worked in a mill for 47 years. When Ingram purchased the policy, he was 52 years old. At the time of trial, Ingram had been a Liberty National policyholder for approximately 37 years; he has owned numerous policies. Although Ingram alleges in his brief to this Court that he is illiterate, he admitted during the course of this litigation that he can read and write.
The life insurance policy at issue is an excess-interest whole-life policy. This policy was not designed to be a vanishing-premium policy; instead, it was designed to provide the same benefits as an ordinary whole-life policy. The policy is interest sensitive; however, it guarantees a rate of at least 4%. It reflected guaranteed and projected cash values. The guaranteed cash value was based on the 4% guaranteed *226 accumulation interest rate; the projected value was based on a 9.75% accumulation interest rate. The insured has the option of purchasing paid-up insurance with the cash value of the policy. If the insured does not choose this option, the policy matures when the insured reaches age 100. The first page of the policy clearly states, in bold capital letters: "READ YOUR POLICY CAREFULLY." The first page also provides that an insured may cancel the policy and receive a full refund of any premiums paid within 10 days of receipt of the policy. Page 3 contains a benefit and premium schedule. The word "life" is written under the "years payable" column. Also, page 3-A contains a table of interest rates, which provides that the guaranteed accumulation interest rate on the LifePlus policy is 4%. The policy also contains a table of guaranteed and projected values. This table indicates that when the insured reaches age 62, the monthly income from the policy based on the 4% guaranteed accumulation interest rate is $19.92, and the projected monthly income from the policy based on the 9.75% accumulation interest rate is $250.69.

IV.
In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), this Court held that to recover for fraud, the plaintiff must prove that he or she reasonably relied on the defendant's misrepresentation. Before the Foremost decision was released, it was sufficient if the plaintiff proved that he or she had "justifiably" relied on the defendant's misrepresentation. See Hickox v. Stover, 551 So.2d 259 (Ala.1989), overruled by Foremost.
This action was filed before this Court decided Foremost; however, Ingram requested that the trial court charge the jury on the reasonable-reliance standard.[3] Because Ingram did not object to  indeed, he requested  the reasonable-reliance jury instruction, the reasonable-reliance standard became the law of the case before us. See Rule 51, Ala. R. Civ. P., providing, in pertinent part:
"No party may assign as error the giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless the party objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection."
See also Alfa Mutual Insurance Co. v. Northington, 561 So.2d 1041, 1047 (Ala.1990), which states:
"This Court cannot undertake to review the propriety of a trial court's oral charge unless that charge has been timely objected to and the objection has been overruled by the trial court.... There is no ruling by the trial court for us to review on the issue of the constitutionality vel non of punitive damages, and the trial court's oral charge became the law of the case."
Therefore, the post-Foremost standard applies.
*227 Liberty National also requested and received a jury instruction on the post-Foremost standard for determining when the statute of limitations began to run.[4] Ingram did not object to this charge. Therefore, the post-Foremost standard for determining when the statute of limitation began to run became the law of the case.
This Court in Foremost stated:
"If we were to apply the objective standard for determining the statute of limitations issue in fraud cases that existed before Hicks [v. Globe Life & Accident Insurance Co., 584 So.2d 458 (Ala.1991),] and that has been readopted today, we would hold that the plaintiffs should have discovered [the sales agent's] misrepresentation concerning the first year's premiums when they signed and received their sales documents. Because they each received their sales documents more than two years before filing this action, their misrepresentation claims would be barred by the two-year statute of limitations."
693 So.2d at 422.
Liberty National argues that Ingram's fraud and suppression claims were barred by the statute of limitations. "Claims of fraudulent misrepresentation and suppression are subject to a two-year statute of limitations." Foremost, 693 So.2d at 417, citing § 6-2-38(l), Ala.Code 1975. Ingram signed the application for the insurance policy on July 10, 1985. The agent delivered the policy on August 1, 1985. Therefore, the statute of limitations began to run, at the latest, on August 1, 1985, when Ingram "received [his] ... document[]," Foremost, 693 So.2d at 422; therefore, when Ingram filed the underlying action on March 19, 1996, his claim was more than 10 years old and was barred by the two-year statute of limitations.
Moreover, in order to recover for fraud, Ingram must establish (1) that Liberty National made a false representation, (2) that the misrepresentation involved a material fact, (3) that Ingram relied on the misrepresentation, and (4) that the misrepresentation damaged Ingram. See § 6-5-101, Ala.Code 1975, and Foremost, 693 So.2d at 422.
This Court in Foremost stated:
"[W]e conclude that the `justifiable reliance' standard adopted in Hickox [v. Stover, 551 So.2d 259 (Ala.1989)], which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the `reasonable *228 reliance' standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983). The `reasonable reliance' standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the `reasonable reliance' standard will once again provide a mechanism ... whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."
693 So.2d at 421.
In the present case, it appears that Ingram was capable of reading the policy and the yearly reports he received regarding the policy. Ingram alleges in his brief to this Court that he would not have understood the policy if he had read it, and he cites a page of the record as support for that allegation. (Ingram's brief in case no. 1021032, p. 8.) However, the record does not support this allegation. The policy indicates both that premiums were payable for the life of the policy and that the guaranteed accumulation interest rate was 4%, not 9.75%. Ingram also received at least nine yearly reports, each of which indicated that the interest rate used to calculate the value of the policy was below 9.75%.
Both of the plaintiffs in Foremost had the equivalent of a high-school education or better, and both plaintiffs testified that they would have discovered the alleged fraud if they had read their sales documents and insurance policies. This Court stated in that case that "[i]f we were to apply the objective standard for determining the statute of limitations issue in fraud cases ... that has been adopted today, we would hold that the plaintiffs should have discovered [the agent's] misrepresentation when they signed and received their sales documents." 693 So.2d at 422. Ingram similarly testified that he would not have purchased the policy if he had read it.
In Green, supra, the plaintiffs, Bonnie and Andy Green, had an eleventh-grade education and a high-school education, respectively. Both Greens were 47 years old at the time they purchased the policy. Andy had owned a tire business for 20 years and a hay business for 10 years, and he had employed lawyers and other professionals to assist him with those businesses. Bonnie worked as a bookkeeper. The Greens alleged that the Alfa agent misrepresented or suppressed information regarding an insurance policy the Greens purchased insuring Bonnie's life. Specifically, the Greens alleged that the agent indicated that the Greens would not have to pay premiums "after either the seventh or ninth year, but in no case beyond the ninth year." Green, 881 So.2d at 988-89. At the time the agent allegedly made the misrepresentations, the Greens were shown a document that indicated that "the policy they were presented with was an `Interest Sensitive Plan'; that the column of the policy headed `Guaranteed' showed that the Greens would have to pay $8,115 annual premiums until Ms. Green was 75 years of age or for 28 years; and that the policy would be paid up in nine years only if the interest rates remained at 8.5%, as indicated in the column headed `Projected Vanish  8.500%.'" 881 So.2d at 992. This Court held "that the Greens have not shown any reasonable reliance by them on *229 anything [the agent] said before the Greens paid the partial premium." 881 So.2d at 992. See also Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454 (Ala.2000).[5]
In the present case, Cook allegedly represented to Ingram that the policy he was purchasing would accumulate value based on a fixed interest rate of 9.75% or more, and that if Ingram paid the premiums for 10 years he would no longer have to pay premiums; however, the policy indicates both that premiums were payable for the life of the policy and that the guaranteed accumulation interest rate was 4%, not 9.75%. Ingram also received nine yearly reports that indicated that the actual interest rate earned during the term of the report was below 9.75%. Ingram was capable of reading the policy and the yearly reports. Ingram did not reasonably rely on Cook's representation.
Liberty National appeals the trial court's denial of its motion for a judgment as a matter of law not only as to Ingram's fraud claim, but also as to Ingram's fraudulent-suppression claim. In order to establish fraudulent suppression, Ingram had to present substantial evidence indicating (1) that Liberty National suppressed a material fact (2) that Liberty National had a duty to disclose (3) because of a confidential relationship between Liberty National and Ingram or because of the circumstances of the case, and (4) that Ingram was damaged as a proximate result of the suppression. § 6-5-102, Ala.Code 1975, and Richardson v. Liberty Nat'l Life Ins. Co., 750 So.2d 575, 578 (Ala.Civ.App.1999). However, in Richardson, the Court of Civil Appeals stated: "If one receives from a defendant documents that put him on notice of the very facts alleged to have been suppressed, then that defendant cannot have suppressed those facts." Id., citing Robinson v. JMIC Life Ins. Co., 697 So.2d 461 (Ala.1997); Henson v. Celtic Life Ins. Co., 621 So.2d 1268 (Ala.1993); Hardy v. Blue Cross & Blue Shield, 585 So.2d 29 (Ala.1991); and Tillery v. Security Pac. Fin. Servs., Inc., 703 So.2d 402 (Ala.Civ.App.1997). Ingram received several documents from Liberty National that contained the allegedly suppressed information. Therefore, we conclude that Ingram has not established that Liberty National suppressed a material fact.

V.
Viewing the evidence in the light most favorable to Ingram, we hold that Ingram's claims are barred by the applicable statute of limitations, and that, even if they were not, Ingram has not established that he reasonably relied on Liberty National's alleged misrepresentations or that Liberty National suppressed a material fact. It was, therefore, reversible error for the trial court to deny Liberty National's motion for a judgment as a matter of law. We reverse the trial court's order denying Liberty National's motion for a judgment as a matter of law and render a judgment as a matter of law in favor of Liberty National. Because of our resolution of *230 Liberty National's appeal, we dismiss Ingram's cross-appeal as moot.
1020911  REVERSED AND JUDGMENT RENDERED.
1021032  DISMISSED AS MOOT.
LYONS, BROWN, and STUART, JJ., concur.
HARWOOD, J., concurs in the rationale in part and concurs in the judgment.
HARWOOD, Justice (concurring in the rationale in part and concurring in the judgment).
I concur fully in that portion of the opinion holding that Charles Ingram's claims alleging fraud by misrepresentation and fraudulent suppression of material fact were time-barred under the applicable statute of limitations. The main opinion notes the contents of the policy delivered to Ingram and the explicit statement of the applicable interest rate in each of the yearly reports for the five years 1986 through 1990, which were all less than the 9.75 percent interest rate Ingram alleges was guaranteed. Therefore, whether the statute of limitations began to run as of the date of the delivery of the policy on August 1, 1985, or at some later point in time when the yearly reports would have clearly demonstrated to Ingram that the interest rate on which cash value accumulated was not 9.75 percent, is not controlling; Ingram had been clearly, and repeatedly, advised of the applicable interest rates much more than two years before he filed his action. Therefore, I agree that the judgment in this case should be reversed and a judgment rendered for Liberty National on that basis, as stated in the concluding paragraph of the opinion. Consequently, I need not reach, or comment upon, the alternative rationale that Ingram did not reasonably rely on the misrepresentation or the suppression of a material fact.
NOTES
[1] Ingram testified as follows:

"Q. Well, thank you sir, but I would ask you to please try to answer my question. You understood from talking with Mr. Cook at the time he explained this LifePlus policy to you that in order for your policy values to build like he was showing you on the illustration, that the interest rate was dependent upon the 9.75 interest rate, didn't you?
"A. Right. Right."
[2] The 1986 report stated "CURRENTLY CREDITED RATE OF INTEREST(3) 7%." The reports sent by Liberty National after 1986 were in a different form. They stated, in pertinent part, "Interest was credited on your money during the previous three quarters at rates of 8.0%, 8.0%, and 8.0%. During the current quarter, interest was credited at the rate of 8.0%."
[3] The trial court gave the following instruction, which was requested by Ingram:

"In order to recover from [sic] misrepresentation or fraud, the plaintiff's reliance must have been reasonable under the circumstances. In determining whether the plaintiff's reliance has been reasonable, you may take into consideration all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. A plaintiff has not reasonably relied upon a misrepresentation if the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts before acting on the alleged misrepresentation."
[4] The trial court instructed the jury as follows:

"The defendants contend that the plaintiff is not entitled to recover because the plaintiff's claims are barred by the applicable statute of limitations of two years. In cases where fraud is claimed as a basis of relief, this claim must not be considered as having accrued ... until the plaintiff has discovered the fraud or reasonably should have discovered the fraud. Facts constituting fraud are not to be considered as discovered when he should have  when he should have been discovered by a reasonable prudent person.
"Facts constituting fraud are to be considered as discovered when he should have been discovered by a reasonably prudent person. That's how it reads.
"The burden of proof is upon the plaintiff to reasonable satisfy you by the evidence that this action was commenced within two years from the accrual of the plaintiff's right of action. This action was commenced March 19, 1996. Mr. Ingram could not bring this case until he learned of the fraud.
"Fraud is deemed to have been discovered when the person either actually discovered or ought to or should have discovered facts which would have provoked inquiry by a person of ordinary prudence and by simple investigation of the facts the fraud would have been discovered."
[5] In Oakwood, the plaintiffs claimed that Oakwood Mobile Homes misrepresented to them that a document was "for insurance purposes" for Oakwood, when in fact that document, signed by one of the plaintiffs, was an arbitration agreement. This Court noted that the document was clearly titled "Arbitration Agreement" and that the plaintiff who signed the document did not allege that he could not read or that he was somehow prevented from reading the document. This Court stated that the plaintiff's reliance on the representation that the document was for insurance purposes "was not reasonable inasmuch as [the plaintiff] would have had to have closed his eyes to the truth to believe that the document was not an arbitration agreement." 773 So.2d at 461.